## BITNER v. STATE.

### (*Knoxville.* September Term, 1914.)

1. **HOMICIDE. Sufficiency of evidence. Self-defense.**

On a trial for homicide, evidence *held* to show by the preponderance thereof that the killing was done in necessary self-defense, and hence a verdict finding accused guilty of voluntary manslaughter was against the weight of the evidence. (*Post, pp.* 145-157.)

Case cited and approved: Grainger v. Slate, 13 Tenn., 459.

2. **HOMICIDE. Self-defense. Necessity of killing.**

Where great bodily violence is being inflicted or threatened upon a person by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justified in using a deadly weapon, whether the bodily violence is being or about to be inflicted with a club, a rock, or with the fists of an overpowering adversary of superior strength and size. (*Post, pp.* 157, 158.)

Case cited and approved: State v. Bowling, 3 Shan. Cas., 110.

---

FROM WASHINGTON.

---

Appeal from Circuit Court, Washington County.— DANA HARMON, Judge.

J. R. GARDNER and THAD A. Cox and S. S. KIRKPATRICK, for appellant.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. JUSTICE FAW delivered the opinion of the Court.

Thomas Bitner was found guilty of voluntary manslaughter, by a jury in the circuit court of Washington county. His motion for a new trial was overruled, and an indeterminate sentence of from two to ten years imposed upon him, whereupon he appealed to this court.

Bitner admitted, in his testimony before the jury, that he shot Ben Broyles on October 7, 1913, and it is proven that Broyles died, from the effects of the wounds thus inflicted, about three weeks later.

Broyles owned and lived upon a farm in Washington county, and Bitner was a tenant on Broyles' farm. The trouble between deceased and plaintiff in error seems to have grown out of a dispute concerning the contract under which Bitner occupied a house on the farm of Broyles. The merits of the controversy between the two men about the contract are not material to the issues in the present case, and were not fully developed in the proof; but some occurrences growing out of this dispute appear in the record, and tend to throw light on the mental attitude of the parties at the time of the encounter in which Broyles received a mortal wound at the hands of Bitner.

Bitner testified that about four weeks before the shooting Broyles met him in the road and asked him to help him (Broyles) "put up hay," to which request Bitner replied that he had taken a contract to haul a stack of lumber and was to begin hauling same on

130 Tenn. 10

the following day, and therefore could not help Broyles "put up hay." Broyles thereupon said, "You will have to help me or get out of the house as soon as I put some other man in there." Bitner insisted that he had rented the house and garden and barn "until his crop was in," but Broyles said, with an oath, "That don't make any difference, . . . you have got to help me," and dismounted from his horse (both men being on horseback at the time) and, picking up a rock, announced that he would "just settle" with Bitner.

Bitner said, "No, Mr. Broyles, you are too big a man for me to get off and fight, and you with a rock in your hand;" and thereupon Bitner rode away. Broyles followed for some distance, challenging Bitner to get off his horse and fight, but Bitner declined to do so.

Plaintiff in error is substantially corroborated, as to what was done on the occasion just mentioned, by the witness Will Church, who, as far as the record shows, is a disinterested and truthful witness. Church did not hear what was said, on account of the noise of his own wagon running over a stretch of rocky road; but he saw Broyles dismount and secure a rock and make a threatening gesture as if to throw the rock at Bitner, and saw that Bitner made no counter demonstration. Church was only twenty-five or thirty yards from the two men, and he says that Broyles looked "pretty red in the face," and that Bitner looked like he was "scared pretty bad."

The quarrel just described occurred, as stated, about three or four weeks before the shooting. So far as appears, there was not further trouble between deceased and plaintiff in error until the night immediately preceding the fatal meeting. About dark on the night last mentioned, plaintiff in error discovered, on reaching his home, that some cattle were in a cornfield on the farm of deceased, and plaintiff in error called to some one at the house of deceased (which was in speaking distance of the house occupied by plaintiff in error) and inquired if Mr. Broyles was at home, and, on receiving a reply in the negative, inquired for Charley Foster, an employee of deceased, and requested that Foster be told that the cattle were in the corn. Foster thereupon went about getting the cattle out of the corn, and, while he was thus employed, the deceased drove up, and, on learning from Foster that plaintiff in error had given him (Foster) information that the cattle were in the corn, deceased asked plaintiff in error why he had not gotten the cattle out himself, to which Bitner replied that he "thought it was a favor to call over and tell him." Deceased, it seems, became angry, and invited plaintiff in error to come out in the road, stating that he would whip him "right now." Bitner remained in his house, where he had been during the conversation, whereupon deceased said, "If you won't come to the road, I will see you on the road, and then I will settle it with you."

This account of the incident just related is taken from the testimony of the plaintiff in error, but he

is fully sustained in this matter by the State's witness Foster, except that Foster does not testify to the concluding threat of the deceased that he would see plaintiff in error on the road and "settle it" with him. However, it is due plaintiff in error to say that Foster does not, either directly or inferentially, contradict plaintiff in error with reference to the threat of Broyles, but says that, after Broyles got out of his buggy and invited Bitner to come down to the road, he (Foster) "never paid any attention to what they said then to one another," and did not know what was said thereafter.

The fatal combat between deceased and plaintiff in error occurred early in the morning of the day following the altercation just described. Deceased and the witness Foster were engaged in digging post holes along the margin of a road near the home of deceased, and likewise near the home of plaintiff in error. Bitner, the plaintiff in error, riding a horse and leading another, both of which were wearing harness, and on the way from his home to his work in a field he had rented, passed deceased and Foster at the place where they were at work as before stated, but, when Bitner had proceeded about eight feet beyond Broyles and Foster, he was accosted by deceased, and the shooting followed in a very short time, possibly one or two minutes, judging from the narrative of what occurred in the meantime.

So far as disclosed, the only persons, other than deceased, who saw the shooting, or heard the altercation

which immediately preceded it, were the State's witness Foster and the plaintiff in error. Foster's account of the circumstances which immediately surrounded the shooting will appear from an excerpt from his testimony as follows:

"Tom Bitner had rented oats ground, and he was going up there that morning to sow his oats, and me and Ben Broyles were going out there to put in post holes and stretch wire to shut cattle in, and I saw Tom coming up the road, and he was on his horse and leading another, and he got, I think, about eight feet by, when Ben Broyle, said, 'Mr. Bitner,' and he stopped then; and Tom says, 'Yes;' and Ben says, 'If there is anything you have got in the barn, get it out; I am going to lock it;' and he says, 'My hay is in there, and my horse is in there, and if you lock it you will unlock it.' Ben asked him what he was to pay for rent, and he say, 'I was to work for you through harvest time at a dollar a day;' and he says, 'I have;' and Broyles didn't dispute it; and he was in the big road; and Broyles says, 'I will whip you,' and made for the big road; and we were in about five or six feet of the big road. Q. On whose land was Broyles? A. Broyles went into the big road, and, as he started to go, I says, ·You had better not go into the big road, Ben, you will get into trouble,' or something like that. Q. Why did you say that? A. I thought there was going to be trouble, and Tom seemed to be scared. Q. What had you heard Tom say before that? A. I heard him say, 'I don't want to have any trouble.' He went into the

road and said, 'Get off your horse, Tom.' Q. How was
Tom dressed? A. Pretty good clothes, and had his
coat on him. I thought he had been at work. I never
paid much attention to him. When he got into the
road, Tom rolled off, and Ben went up on him four or
five steps, and Tom told him 'to stay of me, Ben.' He
just walked up on him, and when he warned him to
stay off of him, and he would not, he put his hand in
his coat this way (indicating), and clicked twice, and
Broyles asked him two or three times if he had a gun,
'Have you got a gun, Tom?' and he didn't give him
no answer. He grabbed a rock then, and Tom dodged
the rock, and he threw it about that far from his head,
and reached down for another one, and, when Tom
raised up then, he went to shooting. Q. How did he
(Broyles) have his hands? A. Up this way (indi-
cating). Q. How many times did he shoot him? A.
Four. Q. Where did he shoot him? A. One went in
here and here and here (indicating). Q. Did Broyles
have anything in his hands or about him after he threw
up his hands? A. He just threw them up like that,
one hand like that, and said, 'Stop Tom, I am shot,'
and gradually turned around from the road.''

Foster further states that deceased was in about
five feet of Bitner when he (deceased) picked up the
rock and that the rock was a "sand river rock," about
the size of the witness' fist.

There is no conflict of testimony between the witness
Foster and the plaintiff in error concerning the circum-
stances attending the shooting. It was suggested by

counsel in argument at the bar that possibly there was a conflict between these witnesses on two points, viz.: (1) As to whether plaintiff in error cocked his pistol in his pocket before or after the rock was thrown by deceased, and (2) as to whether deceased threw up his hands at the beginning or at the end of the shooting.

On the point first mentioned, Foster was asked whether the rock was "picked up and thrown" before or after he "heard the clicking," and replied that it was "afterwards." Plaintiff in error stated that, when deceased "reached down to pick up a rock," he (plaintiff in error) cocked his pistol in his pocket. Manifestly there is no inconsistency between these two statements.

On the second point above mentioned, Foster stated that deceased threw up his hands and said, "Tom, I am shot;" but Foster was not asked, and did not undertake to state, when (that is, at what particular stage of the transaction) this occurred. In reference to this matter, plaintiff in error stated that he saw deceased throw up his hands "once," and in response to the question, "When did you see him throw up his hands?" he replied, "After I shot the last shot." He said, "Don't shoot any more; you have done shot me."

We find, from a comparison of the testimony of Foster and plaintiff in error, that there is no conflict between these two witnesses; but the plaintiff in error testified about one matter not referred to by Foster, as will be seen from the excerpt from the testimony of plaintiff in error, which will be presently quoted.

Taking up the narrative of plaintiff in error at the point where he (plaintiff in error) told Broyles that he wanted no trouble with him, plaintiff in error testified as follows:

"He says, 'I will whip you,' or something, and started into the big road; and I says, 'Ben don't start into the road on me;' and he just kept on, and I just turned on my horse, and the buckle on my back strop kindly rubbed the horse, and I went so far over I slid off, and I commenced to back from him; and I said, 'Ben, stay off of me;' and he kept on coming; and I put my hand in my coat pocket; and I said, 'Ben, stay off of me;' and I backed from five to eight steps and kept telling him to stay off of me, and he kept coming, and he reached down to pick up a rock, and when he did that I cocked my pistol in my pocket, and he threw the rock right at my head, and I dodged down, and when I raised up he reached for another rock, and I raised and commenced shooting. Q. How fast did you shoot? A. Just as fast as I could pull the trigger. Q. What was he doing? A. Coming right on towards me as fast as he could, as I thought. Q. What kind of a pistol was that? A. 32 Smith & Wesson, double action. Q. Describe to the court and the jury how you were shooting—fast or slow? A. Fast. Q. Did you—after you shot the first shot, could you see Mr. Broyles? A. Part of the time I could see him; part of the time I could not. Q. What was he doing? A. Gradually coming towards me. Q. Did you see him throw up his hands? A. I did once. Q. When did you see him throw up

his hands? A. After I shot the last shot, he said, 'Don't shoot any more; don't shoot any more; you have done shot me.' Q. How does this kind of a gun work? A. Just keep pulling the trigger. Q. Kindly like an automatic gun? A. Just keep pulling the trigger, and it keeps shooting. Q. Was Broyles still standing up when you saw him? A. Yes, he was standing up when I left him."

It thus appears from the testimony of the plaintiff in error that, after telling deceased that he did not want to have any trouble with him, plaintiff in error backed five to eight steps, in the meanwhile warning deceased to keep off of him; and then he did not draw his pistol from his pocket, or attempt to shoot, until deceased had picked up and thrown a large rock at plaintiff in error, and was in the act of picking up another rock, and, while these things were occurring, plaintiff in error was backing away and deceased was advancing. These statements of plaintiff in error are not contradicted by the witness Foster.

Robert Durham, a son-in-law of deceased, and a witness for the State, heard the shooting. He was at his home, which was between one-eighth and one-fourth of a mile distant, and he says that he heard five shots, and that they were fired rapidly, and that they appeared to be "faster after the first shot." However, Durham says that, at the time he heard the shooting, he did not know where it was, and did not "pay much attention" to it.

Four bullets from Bitner's pistol took effect on the person of Broyles. It is difficult, in fact impossible, to ascertain from the record before this court the location of all the wounds. It appears from the testimony of Dr. Stonecipher, the attending physician, that one ball entered in front, on the left of the median line, below the heart and above the stomach, and, passing through the diaphragm, lodged in the right side. One ball passed through the left arm. And, with reference to a third ball, the doctor says (using his language):

"Another shot passed through the back leather lower part of the suspenders down there, and I think that was the shot of entrance by the hole in the suspenders, and that was, I believe, on the right side and came out right here in front. That could be easily probed through and through."

It appears that deceased was 51 years old, and weighed more than 200 pounds—probably 225 pounds. He was a strong and active man. The plaintiff in error is 31 years of age. His size does not appear in the record, but he was before the jury, and is before this court in person, and this court can see that there was considerable disparity in size between deceased and plaintiff in error; the deceased being much larger, and, we may well believe, much stronger than plaintiff in error.

The character of the plaintiff in error for truth and veracity and peace and quietude is not assailed on the record.

Bitner v. State.

The plaintiff in error sought to show that the deceased had the reputation of being a dangerous and violent man, and one witness testified that his reputation was that of a "dangerous" man, but four or five other witnesses introduced on this point by plaintiff in error testified in substance that the deceased had the reputation of being "fussy" and "quarrelsome," particularly with his work hands and tenants. In rebuttal, five neighbors of the deceased testified that his reputation was that of a quiet, peaceable man, but three of these State's witnesses said on cross-examination that it was a part of the reputation of deceased that he was quarrelsome with his work hands on his farm. The effect of the testimony bearing on the character of deceased is to show that he was not reputed a violent and dangerous man in the community, but he had the reputation of being an irritable, high-tempered man, and inclined to be quarrelsome, especially with the men in his employ and the tenants on his farms.

It was argued by the learned assistant attorney-general that plaintiff in error fired the shots which took the life of deceased, not with the sole purpose of defending himself, but in pursuance of an intention already formed to kill Broyles, if occasion presented; and in support of this insistence the fact is pointed out that plaintiff in error armed himself with a pistol before leaving home to go to the field to work on the morning in question. Plaintiff in error testified that he had owned the pistol three or four years, but was not in the habit of carrying it on his person regularly,

and he admitted that his only reason for putting it in his pocket on the morning the homicide occurred was that he feared trouble with deceased. He stated that there was no other way for him to go to the field with his team except to pass the place where he knew deceased was at work, and remembering the previous attempted assault upon him by deceased with a rock, and more especially remembering the threat made by deceased on the preceding night that he would see plaintiff in error on the road and "settle it" with him, he was afraid to pass deceased on the road without a weapon to defend himself, but that he had no purpose to use the pistol, unless compelled to do so in order to protect himself.

It may be observed that the jury has, by finding the plaintiff in error guilty of voluntary manslaughter only, acquitted him of malice and premeditation, so that the facts, which, it is claimed, tend to establish these elements of the crime of murder charged in the indictment, can now serve no purpose in the investigation of this case, save in so far as they may shed light upon the actions of plaintiff in error at the time of the meeting which culminated in the shooting of Broyles, and thus aid in determining whether or not plaintiff in error kept within his lawful right of self-defense.

The sole error assigned in this court is that the evidence preponderates against the verdict of the jury in that, the weight of the evidence shows that plaintiff in error shot the deceased in his necessary self-defense. This assignment of error must be sustained. It was

insisted in argument, on behalf of the State, that the plaintiff in error had no reason to anticipate anything more than a simple assault and battery upon him by the deceased, and that the means of defense used by plaintiff in error were out of proportion to the requirements of his mere defense and protection, and therefore he was guilty of voluntary manslaughter. The rule of law which the learned assistant attorney-general thus seeks to invoke is sound (*Grainger* v. *State*, 13 Tenn., 459, 26 Am. Dec., 278); but we do not think the facts of the present case admit of its application. That plaintiff in error was afraid of Broyles, and, as described by Foster, was "scared," we do not doubt on this record. The proof satisfies us that, if Broyles had obeyed the warning of Bitner to "keep off of him," Broyles would not have been shot and there was no reason for Broyles to apprehend danger to himself at the hands of Bitner, so long as he refrained from an assault on Bitner. Bitner did not cock his pistol in his pocket until Broyles had stooped to pick up a rock, and Bitner did not draw his pistol until Broyles had thrown at Bitner's head, at close range, a rock which was of sufficient size to constitute, in the hands of a powerful man like Broyles, a deadly weapon, and Broyles was stooping to get another rock.

Where great bodily violence is being inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon

upon his assailant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size. *State* v. *Bowling*, 3 Shan. Cas., 110.

The judgment will be reversed, and the verdict set aside, and the court recommends that a *nolle prosequi* be entered. However the entry of the *nolle prosequi* is a matter resting in the discretion of the attorney-general, and, if he declines to enter same, the cause will be remanded to the circuit court of Washington county for a new trial.