ANNIE MAE HUDGENS AND WILBUR HUDGENS *v.* THE STATE.

(*Nashville*, December Term, 1932.)

Opinion filed May 20, 1933.

J. F. JOHNSON and MARVEN CAMPEN, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

Plaintiffs in error, husband and wife, referred to herein as defendants, were convicted of voluntary manslaughter, the maximum punishment of Annie Mae being fixed at eight years and that of Wilbur at four years in the penitentiary.

Somewhere around nine o'clock on Sunday night, February 14, 1932, Annie Mae, at her home on Edgefield Street in McMinnville, fired one shot from a shotgun into the body of George Elam, from the effects of which he died the next morning. Wilbur was convicted as an aider and abettor. Annie Mae contends that she shot in self-defense. The parties to this tragedy, as well as a large majority of the witnesses, are negroes, and their testimony is in irreconcilable conflict and cannot be harmonized.

The record is quite a large one and we will not detail the testimony in this opinion, but will content ourselves with an outline of the case and the conclusions which we have reached.

Annie Mae is thirty-eight years of age and her husband is twenty-eight. Deceased was twenty-six. The residence of defendants fronts east. The living room has a dormer front and abuts on the street. The door is in the northeast angle of the room and faces in that direction. Annie Mae operates a restaurant, which is located about 50 feet south of her residence and on the same side of the street. About ten o'clock on the Sunday morning in question deceased came to the restaurant where Wilbur was cleaning up and brought with him a pint of whisky, which the two proceeded to drink. About

four o'clock in the afternoon deceased returned and he and Wilbur went to the home of Lawrence Martin, where they drank more whisky. From the record we conclude that both of these parties were considerably intoxicated. In fact, Wilbur spilled a bottle of whisky on the floor on which deceased had paid twenty-five cents, and deceased insisted that Wilbur should reimburse him for this sum. A controversy arose and Martin ordered them off his premises. Wilbur returned to his home. Later in the afternoon deceased again came to the home of Wilbur and they engaged in a fight about the quarter. They were separated and Annie Mae paid deceased the quarter to stop the controversy and requested him to leave. In the fight some furniture was upset and a glass in one of the windows was broken out.

Hershell Faulkner testified that after deceased left Wilbur unbreached and loaded his single-barreled shotgun, and stated if deceased returned he was going to kill him.

After the fight Annie Mae went out on the street and engaged in a colloquy with deceased. Some of the witnesses say she was insisting on him paying for the broken glass. Others say she was criticising him for getting her husband drunk; that he denied the charge and she invited him to her home to prove to him that he was guilty of the charge; that he went with her to her home and just after entering the house they heard the shot. The testimony of Annie Mae is to the effect that she had started to her restaurant to open it when she was accosted by deceased, who used very obscene and abusive language towards her; that she then decided to return to her home; that deceased followed her and said he was going to kill her; that she forbade him to enter her home

and latched the screen door when she entered; that deceased jerked the door open and entered, whereupon she picked up the gun and shot him.

The theory of the State was that Annie Mae induced deceased to enter her home so that she could kill him. The jury rejected this theory and we think properly so.

There is a controversy as to whether Annie Mae latched the screen door when she entered her home. The decided weight of the testimony is that she twice admonished deceased not to come into her home, and that he entered over her protest. The only testimony that contradicts that of Annie Mae to the effect that deceased said he was going to kill her was that of Will Elam, brother of deceased, but we think the weight of the testimony shows that he was not standing in front of the door, as testified to by him, when deceased entered. If deceased was not invited into the home by Annie Mae, and we feel confident that he was not, then unquestionably he entered over the objection of Annie Mae for the purpose of doing violence to her or Wilbur. He had just enough bad liquor in him to make him belligerent and dangerous.

Annie Mae was not drinking and had no conceivable motive for killing deceased except for fear that he would do her violence. She had aided in separating deceased and her husband when they were fighting; she did what she could to appease deceased and get him to leave, but he continued to hang around and was evidently bent on having an encounter with defendants. He, in effect, forced his way into the home when forbidden to enter. The weight of the testimony shows that Wilbur was in bed drunk and unable to defend his wife. The deceased was young, active, and strong. Annie Mae was no match

for him physically. In this situation what was she to do? The conduct of deceased in the circumstances constituted an overt act.

In *Bitner* v. *State,* 130 Tenn., 144, 157-158, it was said:

"Where great bodily violence is being ·inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon upon his assailant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size."

The general rule as to the right of defense of one's habitation is thus stated in 30 Corpus Juris 83:

"It is a general rule, expressly affirmed by statute in some jurisdictions, that a person is justified in taking life in defense of his habitation where it is actually or apparently necessary to do so in order to repel another person who attempts to enter in a forcible or violent manner for the apparent purpose of committing a felony therein upon either person or property or of inflicting great bodily harm or of assaulting or offering personal violence to a person dwelling or being therein."

In 13 Ruling Case Law 840-841, it is said:

"The prevailing rule as to homicide in defense of the dwelling or habitation seems to be that the occupant has no right to take life to prevent the mere unlawful entry into his house if the circumstances are not such as to afford reasonable grounds for the conclusion that life is endangered or great bodily harm threatened. If, however, the assault upon the house and the attempted forcible entry are made under such circumstances as to create

a reasonable apprehension that it is the design of the assailant to commit a felony or to inflict upon the inmates a personal injury which may result in the loss of life or great bodily harm, the danger that the design will be carried into execution being imminent and present,— it is stated by a majority of the courts that the person in whose mind such apprehension is induced may lawfully act upon appearances and take the life of the assailant. Some courts assert broadly that a man's house is his castle and that he may defend it even to the taking of life if necessary, or apparently necessary, to prevent persons from forcibly entering it against his will, and when he warns them not to enter, and to desist from the use of force, and it recently has been said that this is 'the better and sounder rule.' The weight of authority is however plainly the other way; nor is the expression, 'a man's house is his castle,' commonly supposed to mean that in any and every case a person may kill another who unlawfully attempts to enter his habitation. There must be present the element of danger to the person or some occupant of the habitation. This permits the taking of life in case the assailant purposes the commission of any felony, or other crime of violence to the person. In a number of jurisdictions statutes have been enacted upon this subject, which acts, as a rule, excuse the killing of one who attempts to enter for the purpose of doing personal violence to an occupant of the habitation.''

█ Applying these principles to the facts of this case, we feel constrained to hold that the evidence does not support the verdict, and therefore reverse the case and remand it for a new trial. This necessarily results in a reversal of the case as to Wilbur Hudgens also. Hudgens

testified that he was so drunk that he had no knowledge of what transpired that day until he was aroused by the gun firing. Officer Parrish testified that Wilbur was drunk when he carried him to jail that night. The conviction of Wilbur was based primarily upon the testimony of Will Elam, brother of deceased, that he was standing in front of the door and saw Wilbur hand the gun to his wife. But as previously stated, the weight of the testimony shows that Will Elam was not in front of the door.

There are numerous other errors assigned which we find it unnecessary to consider, in view of the fact that it is necessary to reverse the case, and the matters complained of will not likely occur upon another trial.