# Kress *v.* State.

## (*Knoxville,* September Term, 1940.)

### Opinion filed October 19, 1940.

J. ARTHUR ATCHLEY and REUBEN H. NICHOLS, both of Knoxville, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Vina Kress, referred to herein as defendant, has appealed to this court from a sentence of ten years in the State penitentiary pursuant to a verdict of guilty of murder in the second degree.

About nine-thirty on the night of July 16, 1939, defendant shot T. W. Surgenor with a pistol, two or more balls taking effect in his body and producing wounds from which he died about one o'clock on the afternoon of July 18, 1939.

According to the testimony of defendant, she was justified in taking the life of deceased; while, according to the dying declaration of deceased, as testified to by his wife, she deliberately shot deceased at a time when she was neither in danger of death nor great bodily harm. In addition to this, as soon as she shot deceased she hid the pistol on the adjoining premises, and denied having shot deceased for some time when she finally admitted it.

The deceased was a married man, having a wife and two children at the time of his death, and had been married since 1911, their home, prior to 1937, being in Appalachia, Virginia. Defendant, prior to 1937, had likewise resided in Appalachia for many years, having also married there in 1911, and gave birth to three children, now residing in Florida, prior to separating from her husband in 1925. In about 1927, defendant and deceased

became infatuated with each other and lived together as common-law husband and wife from that time until the death of deceased. In 1937 they moved to Knoxville, where they established a beer garden and rooming house at 300 Magnolia Avenue.

The testimony is in narrative form, the important part of that of defendant being as follows:

"The witness further testified that about two years ago Surgenor came to Knoxville and opened up a restaurant and beer stand, returned to Virginia and tried to persuade her to come to Knoxville and help him operate the beer stand, but that she refused to come with him; he told her that if she did not come he would kill her, and that she, being afraid that he would take her life or do her some bodily injury, finally came to Knoxville to live with him and help him operate the beer stand.

"She further stated that during the time they lived together and operated the beer stand in Knoxville for a period of about a year and a half they had numerous quarrels and fights; that on one occasion they got into a fight and Surgenor burst a beer bottle over her head, whereupon she stabbed him with an ice pick; that they both were arrested as a result of this altercation, and placed in the municipal jail by the Knoxville police, but were finally released.

"She stated that in March, 1939, after having another fight with Surgenor, she left him and turned the beer stand over to him and went out into Union County, Tennessee, on Bullrun Creek, and there opened up a place of her own and proceeded to operate it.

"She had not been out there very long when Surgenor came after her one night, arriving there some time after midnight; he brought with him a Mr. Humphreys and his wife, and had two pistols; she stated that he was drink-

ing and she attempted to get him to go to sleep hoping that he would change his mind after he slept off the effects of the intoxicants, but instead he stayed awake all night, telling her that he could not operate his place of business and get along without her and she was either going to come back to Knoxville with him or he was going to blow her brains out. On the following morning he forced her to return to Knoxville with him and live with him and leave her business in the care of her nephew, Robert Wilson, who had been helping her operate it. Upon leaving Surgenor told her nephew, Wilson, that he could have the business for $10.00, that Vina was not coming back to operate it any more because she was going to stay with him.

"She stated that upon returning to Knoxville he continued to drink, and that after they came back to the house and beer stand on Magnolia Avenue, he drank a large quantity of beer, sat down at a table, took out a pistol, and first threatened to shoot a hole through the icebox, then threatened to shoot her, and that after much persuasion on her part and with the aid of Mr. and Mrs. Humphreys, she persuaded him to eat some breakfast which she had prepared for him, and finally got the two guns away from him and put them away.

"Sometime after this they became involved in another quarrel and Surgenor broke her nose with his fist; she further stated that he was a large and strong man, weighing about 220 pounds, and in good health, and that every time he got to drinking, which was quite often, he would assault her and beat her, often inflicting upon her severe and painful bruises and injuries about the face, eyes and other parts of her body. She stated that he was a dangerous man, and that she was afraid of him and was often

forced to call the police officers for protection against him.

"She stated that on the evening of July 16, 1939, Surgenor came into the beer stand, which was operated in one room of the house in which they lived, and took $60.00 in money, which she had in her bosom, away from her, assaulted and beat her, inflicting upon her body several bruises.

"Soon after this his sister and brother-in-law came to see him and he went out to the front porch and sat down to talk with them; she said that she also went out and down the street where she met a Mr. Shannon whom she requested to call the officers to arrest Surgenor for beating her and taking her money; after Shannon had called the officers for her, she went back to the house and the officers came up in an automobile just before she entered the house; she talked with them and told them what he had done to her, and they refused to go into the house and arrest him until she went to the court and swore out a warrant for him; this was on Sunday night, and the officers told her to come to the courthouse or jail upon the following morning and get a warrant and they would come back and arrest Surgenor; she stated that at the time she was talking to the officers their car was parked on Morgan Street at the west side of the house where she and Surgenor lived.

"After talking to the officers some ten or fifteen minutes she went back into the house entering at the back door with the intention of going to her room and going to bed. This was about 9:30 P. M. according to her best impression of the time.

"She stated that in going to her room she had to pass through a hallway and by the room where Surgenor slept. She stated further that when she entered the house all

of the lights had been burned out, and none of them were burning; upon passing the door to Surgenor's room he stepped out into the hallway, seized her by the bosom of her dress, jerked her into his room, and said:

" 'You God damn bitch, you called the law on me and I'm going to kill you; this is the last time you are ever going to call the damn law on me.'

"She said that he pulled her into his room and holding her with one hand began beating her about her face and body with his other fist, and that in the struggle she came in contact with his bed, and knowing that he kept one of his pistols under his pillow, she felt under the pillow for the pistol, found it and began shooting. She said that he had hold of her all the time he was beating her, and cursing her, and that about the time she got the pistol in her hand he pulled her back out into the hallway. That it was dark and she could not see, but that he still had her by the bosom of her dress and was beating her with his fist and that she kept shooting until he turned her loose. She said she didn't know how many times she shot but that she stopped shooting when he turned her loose and stopped beating her. She said that he was a strong and powerful man, and that she was frightened and thought that he was going to beat her to death and that she shot him only for the purpose of protecting herself.

"After she had shot him loose from her, he went out into the street through the front door, and she went to the rear door and threw the pistol out the back, and then went back through the house out to where he was and attempted to persuade him to come back into the house and let her get him a doctor; by this time a crowd had gathered around, the police came, and she told the police that she did not shoot him because she wanted to get him to a hospital and get him a doctor.

"Later an ambulance came and took him away, and the police arrested her and took her to jail."

The defendant's testimony as to the cruelty of deceased, his size, strength and habits, and his conduct on the trip to Union County, armed with two pistols, forcing her to return to Knoxville, is abundantly supported by credible witnesses. One witness testified that she worked hard and was practically a slave of deceased.

It is the State's theory that defendant, being unable to prevail upon the officers to arrest deceased, and being angry with him for assaulting her and taking her money, took the law into her own hands, and began shooting the deceased when he entered the house from the front porch.

The dying declaration of deceased, as testified to by his wife, who came to Knoxville immediately upon being advised that he was shot, is as follows: "She further testified that the deceased told her that he had had some trouble with the defendant, and that after his sister and brother-in-law left home on July 16th at 9:00 P. M. he got up from where he was sitting on the porch and started to enter the doorway. That upon entering the door of the house the defendant met him and began shooting at him with a pistol. That he said 'Vina, don't do that' but that she kept on shooting, and that he turned and ran from the house and that defendant continued to fire until she had emptied her gun. That he went out of the house, started up the street but only got a few steps when he fell on the sidewalk."

This declaration was made about 4 P. M. on July 17th. Dr. Hill, the attending physician, testified that small amounts of morphine were administered to the deceased to ease his pain and produce sleep from the time that he was shot until shortly before he died; that at no time was

he given enough to affect his mentality, but that he was quite at himself until a few minutes before he died.

This is a rather close case, and while the defendant has lived a life of shame her conduct is no more reprehensible, if as much so, than was that of deceased, and she should not be punished in this case for her immoral relationship with deceased. As repulsive as her conduct has been, she certainly tried to correct it to the extent of leaving the deceased and removing to another county where she established a business of her own, in which she was assisted by her nephew. After discovering her whereabouts the deceased pursued her and with threats, abuse, and presenting two pistols, forced her to return with him to Knoxville. This tends to corroborate her testimony that under similar circumstances he forced her to leave her home in Virginia and accompany him to Knoxville after he had established himself in that city.

We are not altogether satisfied with this conviction and feel that the defendant should be given a new trial. The trial court evidently had some misgivings about the case since he took the motion for a new trial under consideration for two weeks before overruling it. Likewise, the assistant attorney-general for the State suggests that this might be a proper case in which to recommend to the Governor that the punishment be reduced to that for voluntary manslaughter. In granting the defendant a new trial we do so for the following reasons:

1. Under the facts appearing we do not consider defendant guilty of murder.

2. Officers were on the scene immediately after the shooting, and while the deceased survived nearly two days and, according to Dr. Hill, was in his right mind until shortly before he died, it is rather unusual, in fact remarkable, that he was not interrogated about the affray by any

one, and made no statement coming within the category of a dying declaration to any one except his wife, who was, justly so, very hostile to the defendant.

3. The State's theory is rather unreasonable. If defendant was so infuriated at deceased for assaulting her and taking her money, as the State insists, it would seem that she would have immediately secured one of his pistols, knowing where they were kept, and shot him at the time. On the other hand, he was the one who became enraged because she had called the law.

4. The failure of the court to instruct the jury to receive the alleged dying declaration with caution, although not reversible error in the absence of a special request, may have been prejudicial to the accused in this case.

5. The court gave this instruction to the jury:

"It is the further theory of the state that the defendant shot the deceased from motives of hatred and by reason of old trouble that had existed between them for a long time; that said shooting was done willfully, unlawfully and with malice aforethought.

"If you believe the theory of the state beyond a reasonable doubt, the defendant is guilty of murder in the second degree and you should convict her of that offense."

We find no evidence in the record to support this theory of the State. As a matter of fact, the theory of the State was not predicated upon an old grudge, but upon a killing in the heat of passion resulting from the assault and battery and the forcible taking of her money. It may be that the jury, from the foregoing instruction, understood the court to mean that if deceased beat defendant and took her money, and being angered by his conduct in this regard shot him, that she would be guilty

of murder in the second degree, while under the law that would be a question for the jury to decide.

6. For newly discovered evidence based upon the testimony of William Hundley given on the motion for a new trial. This witness testified that he had known deceased for fifteen years, and went to his home on the night of the shooting to get some medicine from an herb doctor who was boarding there; that upon entering the house he heard a commotion and heard the deceased say: "God damn you, you called the law on me, and I am going to kill you." This witness testified that he became frightened and, not wishing to be a witness to or involved in such trouble, hurried away, and when about a half block off heard some shots, whereupon he hastened to his home and did not disclose what he heard until after the trial. The defendant and her counsel made affidavits that they were duly diligent in procuring witnesses and had no means of knowing that Hundley came to this home that night, or that he had any knowledge or information about the affair. We do not mean to say that the trial court abused his discretion in denying a new trial because of this newly discovered evidence, but this simply being one of the circumstances that has induced us to grant a new trial.

7. The court instructed the jury that "in passing upon the evidence in this case, you may look to what the proof shows as to the location of the difficulty, the size, age and physical condition of the parties involved;" etc.

No request for an additional instruction along this line was made by counsel, but in a case of this character where there is so much disparity in the size and strength of the parties, particularly where, as in this case, the slayer is a woman, in fairness and justice to her, she would have the benefit of the rule announced by

this court in *Bitner* v. *State*, 130 Tenn., 144, 157, 158, 169 S. W., 565, later approved in *Hudgens* v. *State*, 166 Tenn., 231, 235, 60 S. W. (2d), 153, 154, as follows:

"Where great bodily violence is being inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon upon his assailant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size."

There is another circumstance that has impressed us, and that is in all of the previous combats of a serious nature the deceased was the aggressor. This is established by other testimony than that of defendant, and people who roomed in their home testified to the cruelties of deceased toward defendant, and that she would frequently appear with bruises, black eyes, and on one occasion with a broken nose.

As previously stated, we are convinced that defendant is not guilty of murder in the second degree, and in view of what we have said we would feel better satisfied if she were given another opportunity to establish her claim of justifiable homicide rather than to affirm the case and recommend a commutation to voluntary manslaughter. We, therefore, reverse the case and remand it for a new trial.