# KATHERINE HILL et al., Appellants, v. MINNIE LEE ALSOBROOK et al., Appellees.—370 S.W. (2d) 506.

Western Section. December 17, 1962.

Certiorari Denied by Supreme Court September 11, 1963.

Adrian Lowenthal, Memphis, for appellants.

Henry H. Lehman, Memphis, for Appellees.

BEJACH, J. In this cause Katherine Hill, David Alsobrook, Isaac Alsobrook, Arelean Alsobrook, and James Alsobrook brought suit against Minnie Lee Alsobrook, Life Insurance Company of Georgia, Metropolitan Life Insurance Company, Interstate Life & Accident Insurance Company, Dan Mitchell, Shelby County Commissioner, and M. A. Hinds, Sheriff of Shelby County, Tennessee, seeking to prevent Minnie Lee Alsobrook from collecting or receiving the proceeds of insurance policies and wages due Q. Z. Alsobrook, the former husband of Minnie Lee Alsobrook.

The parties will be styled in this opinion, complainants and defendants, or called by their respective names.

Complainants are the brothers and sisters of Q. Z. Alsobrook, and they undertake to prevent Minnie Lee Alsobrook, his widow, from inheriting, acquiring, or taking the proceeds of insurance policies on his life or any other personal property, such as wages due him as an employee of Shelby County, on the ground that defendant, Minnie Lee Alsobrook, feloniously killed him on June 10, 1961. Minnie Lee Alsobrook defends on the ground that the killing was accidental or in self defense.

An Administrator ad Litem was appointed by the Chancellor, and some of the assets of Q. Z. Alsobrook have been paid to him. The law applicable to the case is set out in Section 31-207 T.C.A., which is as follows:

"Any person who shall kill, or conspire with another to kill, or procure to be killed, any other person from which said first named person would inherit the personal property, or any part thereof, belonging to such deceased person at the time of his death, or who would take said property, or any part thereof, by deed, will, or otherwise, at the death of the deceased, shall forfeit all right therein, and the same shall go as it would have gone by the law of distribution, will, deed or other conveyance, as the case may be, provided, that this section shall not apply to any such killing as may be done by accident or in self-defense."

Deceased, Q. Z. Alsobrook, and defendant, Minnie Lee Alsobrook, his wife, were both employed at the Shelby County Hospital. On the evening of June 10, 1961, Q. Z. Alsobrook and Minnie Lee Alsobrook had been out together. He had been drinking. She was driving the automobile in which they were riding. They had quarrelled on the way home, and at about 11:00 to 11:30 P.M. when they arrived at the Shelby County Hospital, where both of them were employed, he got out of the automobile and came around to the driver's side of same. He opened the door, and began hitting his wife in the face, striking both upward and downward in his attack on her. Minnie Lee testified that this was the most severe beating she had ever received at the hands of her husband. The fact that he was beating her is corroborated by George H. Sing, night watchman at the Shelby

County Hospital, who testified that he flashed his spotlight on the automobile in question and saw Q. Z. beating Minnie Lee, but that he did nothing about it. Later, both Q. Z. and Minnie Lee Alsobrook went to their room to retire. According to her testimony, while she was putting on her hair net, Q. Z. renewed the altercation and began beating her again. She testified that he was between her and the door, which prevented her leaving the room and going elsewhere to spend the night, as she had done on several previous occasions. In that situation, according to her testimony, she reached up into a box where she kept a pistol which she had purchased several years before, and shot twice. Her testimony is to the effect that she meant to ''scare'' him, and that his death from the shooting was, therefore, accidental; but that, in any event, the shooting was in necessary self defense, because she feared death or serious bodily injury at his hands. One of the shots fired by Minnie Lee struck Q. Z. near the right shoulder and ranged downward through his body. The bullet from the other shot was found embedded in the mattress of the bed on which Q. Z. lay. His body was found lying crosswise of the bed, with one leg over the bullet which was embedded in the mattress. There was, however, no wound in that leg, and the bullet had not damaged the leg of his trousers. Minnie Lee called the Police Department, and as a result of this call, two deputy sheriffs were sent out, the Shelby County Hospital being outside the corporate limits of the City of Memphis. According to the testimony of these deputy sheriffs, Minnie Lee cooperated with them and gave to them substantially the same account of the killing as she gave in her testimony in this case. She was taken first to John Gaston Hospital where she

was examined by Dr. Martin Baker, at that time an intern there. He testified that ''she had obviously sustained a rather severe beating.'' She had, according to his testimony, considerable swelling about the nose and mouth, and had a scleral hemorrhage, which he explained meant a bleeding in the white portion of the eye. Dr. Baker testified that it would normally take about 6 to 12 hours for such swelling to dissipate. A photograph of Minnie Lee showing comparatively little injuries is filed as one of the exhibits in the record, and complainants rely on this as tending to show that Minnie Lee, at the time of the killing, had not been seriously injured, and therefore could not have justifiably feared either death or serious bodily injury. We consider this contention to be without merit, however, because the photograph in question was not taken until about 16 to 18 hours after the killing.

It appears in the record that, in the Criminal Court, Minnie Lee Alsobrook was convicted of voluntary manslaughter, which conviction has been appealed. It is conceded, however, by counsel for complainants that the conviction in the Criminal Court is not controlling in this case. The law applicable, in a civil suit, is the same as if the cause were being prosecuted in the Criminal Court, except that in the civil suit a mere preponderance of the evidence is sufficient. Hunt-Berlin Coal Co. v. Paton, 139 Tenn. 611, 202 S.W. 935.

After a hearing on oral testimony, which is preserved in the record before us in a bill of exceptions, the Chancellor found in favor of the defendant and dismissed complainant's bill. From the opinion of the learned Chancellor, we quote as follows:

"It appears that on Saturday, June 10, 1961, both Alsobrook and his wife were employed at the Shelby County Hospital and occupying a room there.

"Alsobrook was employed in the kitchen and his wife as a waitress in one of the dining rooms.

"Alsobrook is shown in proof to have been what may be termed as a steady and constant, though possibly an intermittent drinker. When drinking he was quarrelsome and abusive with and to his wife, and at times violent.

"Because of an attack made by him on her, she had, on numerous occasions, been compelled to leave their joint room and sleep in the women's dormitory. On one or more occasions, it was necessary that the law enforcing authorities be called to quiet him.

"On the day of the killing, Alsobrook left work earlier than did his wife, and at about 4:30 p.m. joined with one George Tucker.

"Tucker testified that he and Alsobrook drank a pint of whiskey together and when he left Alsobrook about 8:30 p.m., he left him with the greater part of a half pint of Gin. The Court doubts that this was the total amount of alcohol consumed by Alsobrook, who was described by one witness as 'No drunker than usual though I have seen him drunker.'

"Minnie Lee Alsobrook left the hospital about 6:00 o'clock p.m., with Lucy Belle Chambers and they went to the home of Lucy Belle's mother. Alsobrook joined them at the mother's home. Minnie Lee and Lucy Belle, with Alsobrook's consent, went to a restaurant operated by Lizzie Lang, and Also-

brook subsequently joined them. Minnie Lee and Lucy Belle split a quart of beer between them. Minnie Lee requested Alsobrook to take her home and he told her to 'get in the car and wait until I gets ready to go.'

"It is shown that on the previous Saturday, Alsobrook and his wife had an argument at the Lang Restaurant, and he had thrown her into the car.

"The two Alsobrooks started home with Minnie Lee driving and the condition of Q. Z. Alsobrook was what the Court would term as 'Mean Drunk,' regardless of his particular degree of intoxication.

"After arriving at the hospital parking lot, Alsobrook, who had been in the right hand seat, walked to the driver's side, opened the door, and for no known reason except drunken meanness, began beating Minnie Lee, who was sitting under the driver's wheel, about the head and face, showering blows on her by striking down on her head and face, and striking up at her face and head. She was not striking back but was attempting to protect her head and face with her hands.

"Minnie Lee was battered and bruised and she was screaming and begging Alsobrook to cease beating her. The night watchman of the hospital, one Herbert Sing, was attracted by the screaming disturbance and assault, and drove the station wagon in which he was patrolling to about fifteen feet of the scene, threw his spotlight on the parties and saw what the Court has just described.

"Strangely enough this night watchman made no move, by word or act, to halt the assault, but while the assault was in full progress casually drove off.

"Alsobrook then told Minnie Lee that she could see that she could get no protection from the hospital and for her to quit screaming or he would kill her. She quit screaming and, from all of the facts shown, the Court is convinced, as was Minnie Lee, that she, at that particular time could expect no protection at the hospital.

"Alsobrook had removed a motor part so Minnie Lee could not escape by car. He left the parking lot and went in one door of the hospital and she shortly after, went in another door of the hospital and both met in their jointly occupied room.

"Apparently, at that time, Minnie Lee felt that Alsobrook had satisfied and exhausted his sadistic brutality.

"Minnie Lee began putting on a hairnet preparatory for going to bed, and Alsobrook again began assaulting her. She, in trying to escape, reached a position near the door, reached into a cardboard box where was located a pistol and, probably involuntarily, but certainly in the opinion of the Court of an effect to protect herself, fired twice.

"One bullet struck Alsobrook in his right shoulder above his armpit. From this wound he died. It seems certain that Alsobrook was standing when he was shot for the other bullet fired was located in the mattress to which Alsobrook apparently fell, walked or staggered and on which he was lying when

he presumably died. The bullet hole in the mattress was under Alsobrook's leg lying across the mattress but the bullet had not penetrated his leg or trousers.

"Minnie Lee went to the telephone and phoned the authorities and was waiting for them when they appeared on the scene. Minnie Lee was described by the investigating officers as crying and greatly upset but talking with them freely and voluntarily and cooperating in every way possible. This Court was impressed with her candor. The actions of Minnie Lee were not those of a person guilty of felonious homicide.

"Alsobrook is described as thirty-six years of age, about five feet eight inches tall, weighing approximately 260 pounds and very muscular and strong. Minnie Lee appears a normal sized woman in her mid thirties, weighing probably 140 to 150 pounds.

"The Court considers also appropriate and fitting the following language from the Opinion in Kress v. State, 176 Tennessee 478, 144 S.W.(2d) 735, that language being as follows:

" 'Where great bodily violence is being inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon upon his assaultant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size.' "

"That quotation appears on Page 488 of the opinion [in 176 Tenn., on Page 738 of the opinion in 144 S.W.(2d).]

"This Court concludes that Minnie Lee Alsobrook, in the killing of her husband, Q. Z. Alsobrook, acted in her own proper self-defense.

"The Court, in reaching its conclusion, is not unmindful of the testimony of Katherine Hill, one of the complainants, and a sister of Q. Z. Alsobrook, who testified that on the Friday night before the killing, Minnie Lee called her and calmly advised her that she was going to kill Q. Z. This testimony is considered hardly credible. Katherine Hill did not trouble herself to particularly inquire why Minnie Lee was going to kill Q. Z. nor did she bother to call Q. Z. to warn him of this threat against his life though facilities for such warning were present.

"The result is that under the decision of this Court, Minnie Lee Alsobrook will take the policies of insurance, in issue before the Court, free and clear of any debts of Q. Z. Alsobrook. The proceeds of the policies may, at the option of the insurance companies, be paid into the Registry of the Court and disbursed by orders of the Court.

"The accrued wages of Q. Z. Alsobrook and his accumulation in the retirement fund of Shelby County, which have been paid to an administrator ad litem appointed by the Court, will be administered as required by law as part of the estate of Q. Z. Alsobrook, Minnie Lee Alsobrook will take as the widow of Q. Z. Alsobrook in the administration of these funds."

A decree was entered in the lower court in conformity with the Chancellor's opinion, from which decree complainants have appealed to this Court. In this Court, as appellants, they have filed three assignments of error, which are as follows:

"I.

"The Court erred in decreeing that the defendant, Minnie Lee Alsobrook, was entitled to benefit of the plea that the shooting and killing of her husband, Q. Z. Alsobrook, was in self defense and therefore entitles her to receive the proceeds from life insurance policies and assets of his estate.

"II.

"There is no credible evidence to support the decree of the learned Chancellor.

"III.

"The decree of the Chancellor is contrary to both the law and the greater weight and preponderance of the evidence."

▮ This cause comes to us under the provisions of Section 27-303 T.C.A., with a presumption of the correctness of the Chancellor's ruling, unless the preponderance of the evidence is otherwise. In our opinion, not only is there amply and credible evidence to sustain the Chancellor's ruling, but it is our considered judgment that the clear preponderance of the evidence is with the defendant. Consequently, the decree of the lower court must be affirmed.

▮▮ The principal contention of complainants is that the physical facts of the case outweigh the testimony of

defendant, Minnie Lee Alsobrook. This contention is based on the circumstance that the distance from the door of the room where the killing occurred to the bed on which the body of deceased was found, is about 10 or 12 feet, with no blood on the floor between the door and the bed. Complainants contend that, such being the case, Minnie Lee's contention that her escape by the door was cut off must be considered as positively refuted, and their conclusion is that she shot Q. Z. while he was seated on the bed. Such shooting, they conclude must be considered as a felonious one, and not in self defense. They also point out, as stated above, that the picture of Minnie Lee Alsobrook which is in the record, shows very little damage to her face, and consequently, they conclude that she was not in imminent danger of death or serious bodily harm when she fired the fatal shot. The fallacy of this contention has been pointed out above. Our conclusion is, therefore, that Q. Z. was standing when the fatal shot was fired, and whether or not he was between Minnie Lee and the door at that time we consider immaterial. The absence of blood on the floor can be easily accounted for by assuming that Q. Z. staggered or fell onto the bed immediately after he was shot, and that the bleeding did not begin until after he was on the bed. The record shows that most of his bleeding was through the mouth, as a result of internal hemorrhage from the shot which penetrated his body. Even if Q. Z. was standing by the bed at the time the fatal shot was fired, that would not destroy Minnie Lee's right to rely on her claim that she fired in self defense. The true test of Minnie Lee's right to rely on self defense cannot be limited to the exact moment of firing the fatal shot, but must be considered in connection with the whole series of events

leading up to the shooting. On this subject, from Allsup v. State, 73 Tenn. 362, 370, we quote as follows:

"The true rule is, that the facts on which the justification rests, must appear from all the facts and circumstances of the entire transaction, taken as a series of events, and be real, and be acted upon in good faith by the defendant. To confine the attention to the very moment when the blow is given, would in many cases be unjust, and be equivalent to debarring a party from the benefit of the right of self defense altogether."

It has even been held by our Supreme Court in the case of Pearson v. State, 143 Tenn. 385, 226 S.W. 538, that the defendant was not deprived of the right to rely on self defense even where the deceased was retreating and defendant shot him in the back. From the opinion of the Supreme Court in that case, written by Special Justice L. D. Smith, later Attorney General, we quote as follows:

"It is contended by the state that the plaintiff in error cannot avail himself of this defense, because at the time he shot the deceased, the deceased was retreating, with his back to the plaintiff in error. There is practically no dispute that at the time the first shot was fired the deceased was advancing with his gun, and there is practically no dispute in the evidence that at the time the subsequent shots were fired the deceased had his back to the plaintiff in error. The wounds from which the deceased died entered in the back.

"The mere fact that the deceased was fired upon while he was retreating would not deprive the plain-

tiff in error of the right to rely upon his plea of self-defense, provided that under all the circumstances he entertained the belief, and was justified in that belief by the circumstances, that the deceased was not retreating from the fight, but would immediately renew it, and the imminent danger still existed."

Pearson v. State, 143 Tenn. 388-389, 226 S.W. 539.

Our conclusion is that all of appellants' assignments of error must be overruled and the decree of the lower court affirmed. A decree to that effect will be entered here, after which the cause will be remanded to the Chancery Court of Shelby County, Tennessee for distribution to Minnie Lee Alsobrook of the proceeds of insurance policies involved in this case, to which she is entitled, free and clear of the claims of creditors of Q. Z. Alsobrook, and for administration in that Court with reference to other assets of said Q. Z. Alsobrook.

The costs of the appeal will be adjudged against the appellants.

Avery, (P. J. W. S.), and Carney, J., concur.