371 S. W. 2d 441.

(*Nashville,* December Term, 1962.)

Opinion filed October 11, 1963.

634

NOBEL L. FREEMON, SR., JOE A. FREEMON, Lawrenceburg, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, EDGAR P. CALHOUN, Assistant Attorney General, Nashville, for the State.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

Morrison was convicted of voluntary manslaughter of James Hennigan. He has seasonably appealed, filed a brief and assignments of error, and arguments have been heard. After carefully reading the record, briefs

and authorities, we are now in a position to determine the matter. For convenience, the plaintiff in error, Morrison, will hereinafter be referred to as the defendant, his status in the trial court.

Factually there isn't much dispute in this record. The deceased was a cousin of the defendant and had frequently visited his camp in Lawrence County where the defendant trained bird dogs. From this record it seems the deceased was a large man, weighing in the neighborhood of two hunddred (200) pounds, and was forty-six (46) years of age. He apparently had no gainful occupation and carried most of his worldly goods on his back, except a few toiletry articles which he carried in a sack.

The defendant is a much smaller man and older than the deceased. On Monday, May 8, 1962, the defendant returned to his camp in Lawrence County with one Hughes in the latter's car. Upon arriving at the camp they found Hennigan there, apparently sober, making himself at home. The deceased and Hughes began a drinking party that lasted until about noon on May 10, at which time Hennigan was killed by Morrison under circumstances hereinafter related. Both Hughes and Morrison were indicted for this crime, but Hughes was vindicated from any part in it by the jury. This record shows that at the time of this killing the defendant was not drunk while the deceased was very much intoxicated to the extent that his autopsy showed a .32 per cent blood ethyl alcohol content.

The record fails to show any reason why deceased wished to enter the home of the defendant at the time of this homicide. During the night preceding this shooting both Hughes and the deceased had been drinking to

such an extent that Hughes had a hangover and slept most of the next morning. During this time the defendant borrowed Hughes's car and left with the deceased to obtain gasoline and whiskey. As far as the record shows there had been no argument between the deceased and the defendant which would account in any way for the homicide.

A few minutes before the shooting and about noon on May 10, Hughes and the deceased left the defendant's shack, it being their intention to return to Hughes' home in Alabama. After they left the shack the defendant locked the front door. About this time, and after the doors were locked, the deceased attempted to re-enter the defendant's house by the front door, but found that it was locked. As said above there was no reason whatsoever shown in this record why the deceased wished to reenter this house. When the deceased found the door was locked he began kicking the door and trying to get in. About this time, Hughes remembered that he had left his glasses inside and called to the defendant to give them to him. The defendant responded that he would put them out the back door, and, upon this statement being made, the deceased rushed around to the back door ahead of Hughes and started kicking the back door when he found it was also locked.

When the deceased couldn't get in the back door, he returned to the front door, kicked it some more, picked up a stick of wood, and began to beat on the front door again. A pane of glass was broken and the latch or lock was knocked off. Before the deceased gained entry, Hughes, the only eye witness, repeatedly warned the deceased not to kick the door and not to try to get in be-

cause the defendant might shoot him. The record shows that the deceased responded to this admonition by saying that the defendant wouldn't shoot him because he was yellow. There is no question under this record but that the deceased was constantly cursing, and, according to the defendant, threatened to kill him. Hughes, who had run around the house when the glass was broken and the door was broken open, did not hear these statements. As Hughes ran around the house he heard a shot and then the defendant came out of the house. At this time, Hughes is supposed to have asked him, ''Are you crazy?'' Hughes says that defendant replied, ''He broke into my house and I told him not to.'' Hughes then went into the house and looked at the body. There is some conflict about it, but Hughes says that he did not see any stick but there was a lock lying on the floor some seven feet from the door. The deceased was lying inside the house with his feet just a few inches inside the door. After Hughes went into the house, he says the defendant said, ''take me to mama's'', which Hughes did. He drove the defendant to his home which was located a short distance across the state line in Florence, Alabama. Shortly thereafter officers were told about the homicide, and an investigation ensued.

There is a great deal made in the record about the fact that no stick was found close to Hennigan after this homicide. As we see it though this doesn't make any material difference. Whether the deceased had stick of wood in his hand when he entered the defendant's house is only one of the factors to be considered in determining whether the deceased appeared to have the means whereby he could seriously injure the defendant. Of course, he could have seriously injured the defendant in many

ways—by the lock he had in hand; or merely by virtue of the fact that he was a much larger man and was, at the time, in a belligerent intoxicated mood. The mere fact that the defendant had locked him out apparently incensed him to such an extent that it is, in our judgment beyond argument that deceased in every way he could sought to inflict some kind of punishment on defendant. This is not the question though. The question is how did it appear to the defendant. The deceased was the assailant and as to whether or not there was apparently a present, pressing necessity for the defendant to take the life of the deceased to protect his own, or to prevent great bodily harm, was a question for the determination of the defendant under the facts and circumstances at the time.

■ The charge in this case by the trial judge to the jury is the stock printed charge given in murder cases with the correct printed definition of voluntary manslaughter, etc. There was no request made nor is there any charge concerning the rights of an individual when his home is broken into. The charge is not questioned; but we feel that under this charge without any special request, or any particular definition of the rights of one when his home is broken into under these circumstances, that the jury very easily could have misconstrued the rights of the defendant.

The law regarding defense of a habitation, or the place where one is living, is well stated in Wharton's Criminal Law and Procedure, Anderson, Vol. 1, sec. 220, thus:

"When an assault on a dwelling and an attempted forcible entry are made under such circumstances as to create a reasonable apprehension that it is the design

of the assailant to commit a felony or to inflict on the inmates a personal injury which may result in loss of life or great bodily harm, the danger that the design will be carried into execution being imminent and present, the lawful occupant of the dwelling may lawfully prevent the entry, even by the taking of the life of the intruder.''

There are many cases cited as authority for this statement, including our case of *Hudgens v. State,* 166 Tenn. 231, 60 S.W.2d 153 (1933). In the Hudgens case this Court quoted with approval excerpts from Corpus Juris Secundum and American Jurisprudence which, though much longer than that we have quoted from Wharton, in effect say the same thing. Under the same section of Wharton in a later paragraph this is said:

''In a few cases the broad rule has been laid down that a man's house is his castle, and that he may defend it even to the taking of life if necessary, or apparently necessary, to prevent persons from forcibly entering it against his will, and when he warns them not to enter and to desist from the use of force, but the weight of authority is against this extreme view. The expression, 'a man's house is his castle,' cannot be taken to mean that in any and every case a person may kill another who unlawfully attempts to enter his habitation.''

In effect this same exception is stated and adopted in the Hudgens case. Under the facts of the Hudgens case this Court reversed the trial court, because it felt that there was a justifiable homicide. Apparently over the years since the Hudgens case many have felt that this case was authority for the proposition that you could

defend your home under any circumstances if someone attempted to enter therein. The Hudgens case though does not go this far as this Court pointed out in a case decided a few years later, *Wooten v. State,* 171 Tenn. 362, 103 S.W.2d 324 (1937). But in each of these cases the factual situation involved therein was of primary consideration and was the basis of the determination of the respective cases.

Wharton, supra, at sec. 221, in part has this to say:

"In the case of a forcible attack on the habitation, the law does not require that the danger should be real —that is, that the peril should actually exist—to entitle the householder to resist to the taking of life. The defendant may act upon a reasonable apprehension of danger induced by appearances. * * * On the other hand, the law does require that the appearance should be such as would excite a reasonable apprehension of the danger of peril, in order to render the killing excusable."

We think that this is the meaning of the Hudgens case and the authorities on the subject under consideration in this State. We so adopt this statement as the correct rule to be applied in such factual situations. The second head note in the Hudgens case is:

"Where great bodily violence is being inflicted or threatened on person by one much stronger with such energy that person assaulted may reasonably apprehend death or great bodily injury he is justified in killing assailant."

This head note states the correct rule applicable to the factual situation in the present case. Here a man

greatly intoxicated of great strength with the reputa-. tion of being rough and a fighter broke into the home of the defendant who was a much smaller, weaker and older man. Under such circumstances we feel that the facts of this case plainly justified the shooting. There was a present element of danger to the defendant. It seems clear to us that there was created in the mind of the defendant a belief that it was necessary for him to do something to protect himself. Thus it is that we believe the preponderance of the evidence herein shows the right of self defense under the factual situation of this case.

It has been argued that since the deceased, the assailant, was intoxicated and didn't know what he was doing it thus became the duty of the defendant to retreat, run or something of the kind and not defend himself. The law is otherwise. "Thus, if the person assailed is without fault, and in a place where he has a right to be, and put in reasonably apparent danger of losing his life or receiving great bodily harm, he need not retreat, but may stand his ground, repel force by force, and if, in the reasonable exercise of his right of self-defense, he kills his assailant, he is justified." Wharton, supra, sec. 235. At page 517 of the same work, it is said: "If a person is attacked in his own home, or in a building owned by him, he is not required to retreat. The fact that retreat can be safely effected does not render it necessary for a man assaulted in his dwelling to retreat therefrom."

When one voluntarily gets intoxicated this does not deprive the one that this intoxicated person attacks of the right to defend himself against a violent assault. The conduct of a person in a state of voluntary intoxica-

tion is subject to the same rules and principles as the conduct of a sober man. Wharton on Homicide, 3rd Ed., Bowlby, page 453, sec. 282. Upon reading the Hudgens case and the factual situation therein one can readily see that the Court held this, even though no express comment is made on this point. This intoxication is a thing that the jury should consider in evaluating the circumstances as they appeared to the defendant in determining whether the defendant had a reasonable apprehension of danger such as would justify his subsequent acts.

We think that the facts of the present case clearly bring it within the factual situation of the Hudgens case. In the Hudgens case the deceased and the husband of the plaintiff in error in that case, had been drinking and had a fight over a quarter, and then the plaintiff in error attempted after it was over with to talk to the deceased and keep him away. Despite this the deceased came and attempted to enter the home of this couple and this wife shot the deceased and killed him. This Court held under such circumstances that this was justifiable homicide because she might apprehend that her husband who was in bed drunk might be injured or harmed by this attempted intruder. The State insists that the facts in the present case bring it within the Wooten case, supra. We do not think so. In the Wooten case the person who did the shooting was a small boy, but it was done at the instance of his mother who was subsequently convicted. This Court concluded there that she was guilty of voluntary manslaughter and not second degree murder when the person who was killed was her brother who had come with other members of the family to talk with her about her moral life. This is an entirely different situation from the present case. In Wooten there was no question

but that Mrs. Wooten did not expect or have any apprehension at all that her brother and members of her family were going to injure her, but were merely, so to speak, preach to her about the way she was living. This Court held that this was not a justifiable homicide but under the facts of the case should be limited to voluntary manslaughter. Obviously the factual situation in the two cases distinguishes them entirely. As said above, we think the factual situation of the instant case clearly brings it within the factual situation of the Hudgens case.

We end this opinion with a quotation from *Bitner v. State,* 130 Tenn. 144, at 157, 158, 169 S.W. 565, at 568 (1914), which is particularly applicable to the factual situation herein. In the Bitner case it was said:

"Where great bodily violence is being inflicted, or threatened, upon a person, by one much stronger and heavier, with such determined energy that the person assaulted may reasonably apprehend death or great bodily injury, he is justifiable in using a deadly weapon upon his assailant. It makes no difference whether the bodily violence is being, or about to be, inflicted with a club, or a rock, or with the fists of an overpowering adversary of superior strength and size."

Thus it is for the reasons herein expressed we must reverse this case.