IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 17, 2020 Session

**STATE OF TENNESSEE v. RICKY L. HELMICK, JR.**

**Appeal from the Criminal Court for Hamblen County**
**No. 18CR109    John F. Duggar, Jr., Judge**

**No. E2019-02101-CCA-R3-CD**

The defendant, Ricky L. Helmick, Jr., appeals his Hamblen County Criminal Court jury convictions of theft of property valued at more than $1,000 but not more than $2,500 and aggravated kidnapping to facilitate theft, arguing that the evidence was insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., AND ROBERT H. MONTGOMERY, JR., JJ., joined.

Greg W. Eichelman, District Public Defender, and J. Todd Estep, Assistant District Public Defender, for the appellant, Ricky L. Helmick, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Akiah Highsmith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In June 2016, the Hancock County Grand Jury charged the defendant by presentment in case number 16CR058 with two counts of first degree murder for the deaths of Ricky Helmick, Sr. and Natasha Riley, two alternative counts of felony first degree murder, and one count of theft of property valued at more than $1,000 but less than $10,000. Also in June 2016, the Hancock County Grand Jury charged the defendant in case number 16CR044 with one count of aggravated kidnapping to facilitate flight after committing a felony. In a March 2019 superseding indictment in case number 16CR044, the Grand Jury charged the defendant with one count of aggravated kidnapping to facilitate flight after committing the first degree murder of Mr. Helmick. At the same time, the Grand Jury charged the defendant by presentment in case number 16CR044 with one count

of aggravated kidnapping to facilitate a theft of property over $1,000.[1] All the charges related to events occurring between April 7 and April 8, 2016. Following the defendant's request for a change of venue, the two Hancock County cases were transferred to Hamblen County by agreed order and consolidated under Hamblen County case number 18CR109.

Here, we provide the facts only as relevant to the issues on appeal. At the July 2019 jury trial, Jeremy Shaw of the Hancock County Sheriff's Department testified that he was dispatched to an address on Vardy Blackwater Road in Hancock County on April 8, 2016, to investigate a possible homicide. When he arrived at the scene, Bobbie Helmick and Becky Helmick[2] were outside of the residences. Inside one trailer home, he found "a small . . . child sitting in the middle of the floor" and the two deceased victims in the living room and kitchen of the home. He said that he noticed no signs of forced entry. Officer Shaw cleared and secured the residence until other officers arrived. He identified the deceased victims as Rick Helmick, Sr., and a woman who "was a Riley."

On cross-examination, Officer Shaw stated that he was dispatched that day at 7:18 p.m. Although Tennessee Bureau of Investigation ("TBI") officers took over the investigation, Officer Shaw created the crime scene log. He acknowledged that he stated in his incident report that a .38 caliber revolver was found at the scene, but he testified that that was an inaccurate statement, explaining that he had included that in his report because he was told that the firearm was possibly "removed from the crime scene before our arrival."

On redirect examination, Officer Shaw acknowledged that he had recorded the incorrect time on the crime scene log because he made a mistake in converting civilian time to military time. He explained that, in his incident report, he marked the revolver with an "S" to indicate that someone had reported to him that the revolver had been stolen from the residence. He acknowledged that detectives, investigators, and another deputy entered the scene before the TBI agents arrived.

Hancock County Sheriff Brad Brewer, who was a detective with the sheriff's department in April 2016, testified that he responded to a 9-1-1 call from Becky, the defendant's wife. Sheriff Brewer, who had known the Helmick family for approximately 30 years, stated that Mr. Helmick, who was blind, was known as "Big Rick" and that the defendant was known as "Little Rick." When Sheriff Brewer arrived at 1041 Vardy Blackwater, Mr. Helmick's mother, Bobbie, and the defendant's cousin, a small child named Haley Helmick, were outside. Sheriff Brewer explained that Mr. Helmick and the defendant each had a trailer on the property and that the trailers were connected by a shared

---

[1]    The March 2019 presentment identifies the single charge as "COUNT 7."
[2]    Because several of the female witnesses share a last name, we will refer to them by their first names to avoid confusion. We intend no disrespect.

deck; the deceased victims were discovered inside of Mr. Helmick's trailer. He stated that Bobbie reported that she had been restrained to a chair with duct tape, and in the back bedroom of Mr. Helmick's trailer, Sheriff Brewer found a chair with duct tape on it. Sheriff Brewer said that he found Mr. Helmick's body on the couch in the living room with "what appeared to be a gunshot wound" to the back of his head and Ms. Riley's body in a pool of blood on the kitchen floor.

Sheriff Brewer testified that, in addition to his law enforcement job, he owned a collision repair business and an automobile dealership and that, as part of that business, he routinely evaluated vehicles. He estimated that a 1999 Dodge Ram pickup truck that had belonged to Mr. Helmick was valued at $8,000 to $10,000.

Sheriff Brewer stated that he returned to the Vardy Blackwater scene on April 12, where officers found a .45 caliber bullet in a couch cushion and another .45 caliber bullet on the ground outside of a kitchen window. At some point, the defendant asked Sheriff Brewer if he knew who had killed the victims, and Sheriff Brewer replied that he believed the defendant had killed them. At that point, he said, the defendant cried for 25 to 30 minutes and did not say anything else.

On cross-examination, Sheriff Brewer testified that he arrived at the Vardy Blackwater scene at 7:36 p.m. on April 8 and found Bobbie and Deputy Shaw outside, while Becky and Haley were in the defendant's trailer. After officers finished processing the scene on April 8, Mr. Helmick's trailer was released to Mr. Helmick's sister. When the officers returned to Mr. Helmick's trailer on April 12, it had been cleaned up.

Sheriff Brewer stated that he did not receive Mr. Helmick's truck until after the TBI had processed it for evidence. A certificate of title for the truck indicated that Mr. Helmick purchased the vehicle from John R. Fields on April 23, 2011, for $5,000. A certificate of title for the truck, issued to Mr. Helmick on May 27, 2011, was signed by Mr. Helmick to convey title to Blanche E. Graham on February 10, 2015, declaring a purchase price of $1,400. Sheriff Brewer stated, however, that the vehicle was not registered to Ms. Graham. He said that although the second title had been signed to Ms. Graham on the back of the title, Mr. Helmick did not transfer possession of the truck, and the truck remained registered to Mr. Helmick. Sheriff Brewer explained that in order for Ms. Graham to have the title officially transferred to her name, she would have had to take the signed title to the county clerk's office and pay any applicable fees and taxes and that, because Ms. Graham had not done so, the title never transferred to her. Sheriff Brewer said that he released the truck to Ms. Graham after it was processed for evidence. A vehicle registration form indicated that Ms. Graham applied to register the truck in her name on June 13, 2016.

On redirect examination, Sheriff Brewer testified that the Ms. Graham listed

on the back of the truck title was Mr. Helmick's sister. He stated that Ms. Graham did not apply to register the truck until two months after the April 2016 death of Mr. Helmick. He reiterated that the signature on the back of the title had no value until it was recorded.

TBI Special Agent John Sipos testified that he worked as a criminal investigator at the time of the offenses and that he responded to the Vardy Blackwater scene. He noticed no signs of forced entry. He stated that he found duct tape on the floor behind a dining room chair in a bedroom off of a hallway immediately to the right of the front door of the trailer. He collected the duct tape into evidence. The TBI also collected Mr. Helmick's cellular telephone. The telephone's call log indicated that a call was placed on April 7 at 6:04 p.m. and that another call was placed on April 8 at 9:03 p.m., after the victims had been discovered. During cross-examination, Agent Sipos testified that the defendant was the only suspect in his investigation.

Joseph Teal testified that he lived at 1419 Vardy Blackwater Road in Sneedville and that he knew the defendant. He said that on April 8, 2016, at approximately 4:00 p.m., he saw the defendant and his wife at a Hardee's and offered to give them a ride home because they were his neighbors. He drove them home, and the defendant invited him inside for a sandwich. He estimated that he was inside the defendant's trailer for 15 to 20 minutes before going home. Mr. Teal stated that he took a nap on his couch, and that, approximately one hour later, the defendant came to his house and asked Mr. Teal to help him move a washer and dryer to his mother's house in Morristown. Mr. Teal declined, and the defendant became "aggravated at me" and left in a red Dodge pickup truck, which Mr. Teal recognized as belonging to Mr. Helmick.

During cross-examination, Mr. Teal stated that he had lived one-quarter mile away from the defendant. He stated that his encounter with the defendant and Becky on April 8 was uneventful. He said that Morristown was approximately one hour's drive away and that he declined to help the defendant move a washer and dryer because he was tired. He stated that the defendant's behavior did not raise any suspicion to him.

Allen Gibson testified that he lived one or two miles away from the defendant and that on April 8, he was working at his barn at approximately 2:00 p.m. or 3:00 p.m. when the defendant and a woman approached him. The defendant asked for a ride to Sneedville, which Mr. Gibson estimated was four miles away, and the defendant offered to pay Mr. Gibson gas money. Mr. Gibson agreed to give the couple a ride to Sneedville.

On cross-examination, Mr. Gibson testified that he did not recognize the woman with the defendant, but he later learned that she was the defendant's wife, Becky. He dropped the couple off at the Sneedville Garden Apartments, and when the defendant asked if Mr. Gibson could break a $20 bill, Mr. Gibson told him to "forget about" the gas

-4-

money. He said that he returned home and did not see the defendant again. Mr. Gibson stated that his interaction with the defendant was not unusual and that he gave the couple a ride because he was "just trying to be a friend."

Haley Helmick, who was 14 years old at the time of trial, testified that in April 2016, she lived with her grandmother, Bobbie. On April 8, Bobbie received a telephone call, and afterwards the two of them went to the bank and "got all of Big Rick's pills, money, [and] medicine out of the bank." Haley said that they then went to Mr. Helmick's, and, with permission, she went to the defendant's trailer "to play with the cat and see Becky." She stated that the defendant told her not to follow the cat if it went outside and not to bother her grandmother or the victims "because they were counting pills and money." She said that she saw the defendant leave in Mr. Helmick's truck. Haley watched television with Becky until she got bored. When she went to see if her grandmother was ready to go, she saw Bobbie "running across the deck" and "crying and screaming Ricky is dead." Haley stated that she ran to Bobbie and then went to a vehicle to retrieve cellular telephones from the glove box. Bobbie called 9-1-1. At some point, Haley entered Mr. Helmick's trailer and saw the victims.

During cross-examination, Haley stated that she was 11 years old at the time of the offenses. She said that she went with Bobbie to the bank but did not go inside with her. Bobbie exited the bank with "white little bags," which Haley understood to contain medicine because "Big Rick had a lot of medical needs" and because she knew that Bobbie had retrieved Mr. Helmick's medication from the bank in the past. Haley stated that they went directly to Mr. Helmick's house from the bank.

Haley said that it was not unusual for her to go to the defendant's house when she was at the property and that she did not suspect anything was wrong when she did so on April 8. She stated that the defendant was inside his trailer when she arrived and that she did not see him outside. She also stated that, when she entered the defendant's trailer, she saw Bobbie going toward Mr. Helmick's trailer. The defendant left his trailer "almost immediately" after Haley arrived. Haley estimated that she was at the defendant's trailer for approximately two hours and that Becky was with her the entire time. She said that when Bobbie said that Rick was dead, she understood her to mean Mr. Helmick. Haley testified that she saw the defendant talk with Becky before driving away in Mr. Helmick's truck.

Becky Helmick, the defendant's wife, testified that she lived with the defendant at the time of the offenses. On April 7, 2016, Mr. Helmick and Ms. Riley came over to the defendant's trailer for dinner. When the victims returned to Mr. Helmick's trailer at approximately 6:00 p.m., the defendant went with them to carry leftovers. She estimated that the defendant was gone for 30 minutes, and, when he returned, they "just sat

-5-

around and watched TV." She acknowledged that she and the defendant also snorted Opanas that night. She stated that neither she nor the defendant left the trailer that night and that they woke up at 10:00 a.m. or shortly after on the following morning.

Becky said that, at approximately 12:30 p.m. or 1:00 p.m. on April 8, she and the defendant began walking toward town hoping to catch a ride, noting that they did not drive Mr. Helmick's truck unless he was with them. Along the way, they saw Mr. Gibson and asked him for a ride to town to run some errands. While in town, they stopped by Bobbie's house to get a lawnmower battery. At some point, Mr. Teal texted the defendant asking if he "wanted to smoke a joint," and Mr. Teal gave them a ride home. After Mr. Teal left, the defendant went outside to work on a camper, and a few minutes later, Haley arrived. Becky assumed that Bobbie had arrived at the same time. Becky said that Haley played and watched television at the defendant's trailer.

Becky testified that while Haley was there, the defendant "came over in Big Rick's truck and he got out and went in the bedroom, came back out and told me he had to go take care of something and he just left." Becky said that it was unusual for the defendant to be using Mr. Helmick's truck. She acknowledged that the defendant and Mr. Helmick "fussed a lot" over things like "[p]ills, money, he couldn't do nothing right." She said that the men argued over pills because "we would want them and [Mr. Helmick] wouldn't give them to us." Becky stated that she received a text message from Mr. Helmick's telephone number at 8:20 a.m. on April 9. She believed that the defendant had sent the message.

Becky said that on April 8, she placed the 9-1-1 call and acknowledged that she told the 9-1-1 operator that the defendant had gone to find the killers, which information she had learned from Bobbie. She stated that the defendant did not tell her what he was planning to do.

Becky explained that Mr. Helmick used his porch light to indicate when it was appropriate for the defendant and Becky to visit. She stated that when the light was on, "he's busy or he's asleep" and did not want visitors, but when the light was off, "we can go over when we want to." When Becky and the defendant left to go to town on April 8, Mr. Helmick's porch light was still on, indicating that he was not yet up. She said that it was not unusual for the porch light to be on at that time of day but that she was surprised that the light was still on when they returned home later that day. When Becky and the defendant returned home on the afternoon of April 8 and saw that Mr. Helmick's porch light was still on, the defendant went over to check on Mr. Helmick.

During cross-examination, Becky acknowledged that she had a drug problem at the time of the offenses; specifically, she abused Opanas, which she obtained from a doctor and from Mr. Helmick. She also acknowledged that the defendant would assist Mr.

Helmick with distributing his medication. She said that, although the defendant and Mr. Helmick fussed at each other often, they worked together and were very close to each other. She stated that she, the defendant, and Mr. Helmick would travel to Kentucky together and that, on April 8, the defendant was working on the camper in preparation for a trip the following week.

Becky acknowledged that the defendant had been arrested on prior occasions and that, on those occasions, Mr. Helmick paid the defendant's bail and hired lawyers for him. Becky said that Ms. Riley lived with Mr. Helmick "[m]ost of the time," stating, "They would argue and she'd go home and then two hours later, [Mr. Helmick would] have me go back and get her." She said that everyone was getting along during dinner on April 7.

On April 8, Becky entered Mr. Helmick's trailer after the victims had been discovered. She also helped Mr. Helmick's sister clean the trailer two or three days later. Becky stated that, when she heard Bobbie screaming from the deck, she thought that Bobbie had fallen and injured herself. She said that she and Haley ran outside but that the defendant had already left by that point. She acknowledged that she told the 9-1-1 operator that the defendant was going to kill someone because she had seen the deceased victims and believed that the defendant was going to find the perpetrators. She believed that the defendant would take such action because on prior occasions, when the police had been called to the residence, they were only "[s]ometimes quick to respond."

Becky denied that the defendant was acting suspicious in any way during their trip to Sneedville that day. She acknowledged that the defendant and Mr. Teal smoked pot outside after Mr. Teal drove them home. She estimated that Haley arrived 30 minutes after Mr. Teal left and that she placed the 9-1-1 call 30 minutes after Haley had arrived. Becky stated that Bobbie did not have any duct tape on her when she saw her. She acknowledged that she did not enter the bedroom where Bobbie had been taped to a chair.

Becky maintained that the defendant never left her presence throughout the night of April 7 after he returned from taking leftovers to Mr. Helmick's. She asserted that, even though she had "done Opana" that night, she would have known if the defendant had left during the night. She stated that the defendant did not have a gun but that Mr. Helmick had guns stashed throughout his house and that if Mr. Helmick "heard something outside, he would go out there and shoot."

Becky testified that because Mr. Helmick was blind, she, the defendant, and Ms. Riley would drive him around. The defendant would also run errands for him. She said that she had seen the defendant drive Mr. Helmick's truck on occasion without Mr. Helmick but said that he did so only "around the house and to take trash off or something like that, run to the store." Becky said that Bobbie had had knee surgery shortly before the

offenses and, at some point prior, Bobbie had fallen, and the defendant had to help her up. She explained that Bobbie's prior fall and recent surgery led Becky to believe Bobbie had fallen when she heard her screaming.

On redirect examination, Becky acknowledged that the defendant had the opportunity to be somewhere without her knowledge on three occasions on April 7 and April 8: when he walked the victims home after dinner, while she was sleeping, and when she believed he was working on the camper.

Jessie Fox, the defendant's friend, testified that on April 8, the defendant came to Mr. Fox's house driving a red pickup truck. The defendant showed Mr. Fox a .45 caliber Hi-Point gun and discussed selling it, but the defendant changed his mind. Mr. Fox said that the defendant also had some pills with him, including "Roxies and Valium" and "a couple Opanas." Mr. Fox acknowledged that he was abusing drugs at that time. A man named Shane Todd was also at Mr. Fox's house that night, and the three men sat "around and talked" and took pills. Mr. Fox said that the defendant spent the night and that the next day the three men "took the truck over there across the bridge" to "Concrete [B]each" in Bean Station. They left the truck there and returned to Mr. Fox's house. At some point, Mr. Todd left and later called Mr. Fox asking to be picked up. Mr. Fox and the defendant went to pick up Mr. Todd, but, upon their arrival at Mr. Todd's location, law enforcement officers "surrounded" them and "jerked [them] out of the truck." Mr. Fox assumed that the officers were there for him and said to the defendant, "I wonder what they are going to get me for now," to which the defendant responded that the police were probably there for the defendant.

During cross-examination, Mr. Fox acknowledged that his relationship with the defendant involved drug use, but he denied that he owed the defendant anything at that time. He stated that the defendant was staying at Mr. Fox's house "because he said he didn't have nowhere to go. I mean, I thought he was a friend." He said that the defendant had told him that the truck was "his Papaw's," and Mr. Fox told the defendant that "he needed to take it over there" to Concrete Beach and "call him so he didn't get in no trouble for it." He denied that they discussed taking the truck to Sneedville. He acknowledged that he was "pretty close" to being high when the police apprehended them. Mr. Fox stated that he was worried about the defendant's getting in trouble because Mr. Fox believed that the truck belonged to the defendant's "Papaw."

The parties stipulated to the admission of video recordings of Bobbie entering the bank at 5:48 p.m. on April 8 and exiting at 6:08 p.m.

Former TBI Agent James Wiley, whose testimony was presented via a video-recorded deposition because of his unavailability due to military service, testified that he

met with Bobbie at the district attorney's office and took her statement. He then went to the Vardy Blackwater scene, where he found a chair and "a few sections of duct tape that had been peeled of[f] the roll and used" "on the floor in one of the bedrooms." He stated that Mr. Helmick's trailer seemed to be in order and did not appear "tossed around or anything like that."

On April 9, Agent Wiley responded to a boat dock "just outside of Bean Station" where Mr. Helmick's truck had been found. The truck was towed to Knoxville, where the TBI processed it for evidence. Inside the truck, agents "found various pill bottles for prescriptions to Ricky Helmick, Sr.," including Oxycodone, Diazepam, Oxymorphone, and Gabapentin, and a cellular telephone that Agent Wiley later determined belonged to Mr. Helmick. He noted that all of the pill bottles found in the truck were empty, and the Oxymorphone bottle indicated an expiration date of February 16, 2007.

On April 11, Agent Wiley responded to Mr. Fox's home at 1503 Broyles Lane in Hamblen County where the defendant had been staying. He returned to the Vardy Blackwater scene on April 12 and 14 to collect additional evidence related to the homicides. Agent Wiley stated that he was present during the defendant's arrest and that he collected the defendant's clothing into evidence.

During cross-examination, Agent Wiley testified that he responded to the events of April 8 at approximately 7:30 p.m. and first went to the sheriff's office to interview Bobbie. He arrived at the Vardy Blackwater scene at 10:41 p.m. He acknowledged that he entered the crime scene before he and Agent Sipos filmed a "walkthrough" of the scene. He also acknowledged that at least seven people had entered the crime scene before Agent Wiley arrived and that the crime scene log maintained by Deputy Shaw was lacking certain information. He stated that the 1041 Vardy Blackwater address included both Mr. Helmick's and the defendant's trailers and decking. He said that he released the Vardy Blackwater scene back to the family at 3:56 a.m. on April 9, and Agent Wiley acknowledged that the scene was unsecured from that time until officers returned on April 12.

Agent Wiley testified that he and Teddy Collingsworth, a criminal investigator with the district attorney's office, interviewed David Shane Todd on April 9, 2016, at a McDonald's in relation to the investigation. Agent Wiley interviewed Mr. Todd a second time on April 11 at the Hamblen County Sheriff's Office, at which time Mr. Todd admitted having lied in his interview on April 9.

David Shane Todd testified that on April 8, 2016, he and Mr. Fox arrived together at Mr. Fox's house and found the defendant in a red pickup truck in the driveway. At the time, Mr. Todd did not know the defendant. Mr. Todd said that he purchased and

snorted some "Roxies" and that the three men "sat around the truck" for an hour to an hour and a half "just talking." The next day, the defendant "decided to take the truck across the bridge in Grainger County and drop it off," but Mr. Todd did not know the defendant's reason for wanting to do so. At some point that day, Mr. Todd left to meet Teddy Collingsworth at a McDonald's, during which meeting, he learned that the defendant had shot and killed two people. Mr. Todd returned to Mr. Fox's house and told the defendant about his meeting with Mr. Collingsworth. He said that the defendant appeared "a little scared" and "took off to the woods." The defendant returned to Mr. Fox's house either late that night or early the next morning. On April 10, the three men "decided to go riding around a little bit," and they dropped Mr. Todd off at his wife's house between 3:00 p.m. and 3:30 p.m. Mr. Todd remained at his wife's house until 7:00 p.m., when his wife drove him back to Mr. Fox's house. Mr. Todd left again at 1:00 a.m. on Monday morning and went to the Hamblen County Sheriff's Department to talk to Mr. Collingsworth. He acknowledged that he lied to Mr. Collingsworth in their initial meeting by telling him that he had allowed a "random guy" to borrow his cellular telephone. In the meeting on Monday morning, Mr. Todd admitted to Mr. Collingsworth that the defendant had borrowed his telephone. From the sheriff's department and in cooperation with law enforcement, Mr. Todd called Mr. Fox to ask for a ride from the Sunoco on Buffalo Trail.

During cross-examination, Mr. Todd said that he had lived with Mr. Fox for a few months at the time of the offenses. He explained that he lied when he told Mr. Collingsworth that a stranger had borrowed his telephone because he was scared. He said that he had gone to the boat dock prior to his first meeting with Mr. Collingsworth. He also said that he told the defendant and Mr. Fox "exactly who I met with and what it was about"; however, he acknowledged that he did not tell them that Mr. Collingsworth had asked who had used his telephone.

Teddy Collingsworth testified that he identified Mr. Todd's telephone number as one from which the defendant's mother had received a call and that Mr. Todd agreed to meet with him. During their first meeting, he told Mr. Todd that he was looking for the defendant in connection to a homicide investigation. Mr. Collingsworth said that Mr. Todd initiated their second meeting, at which time Mr. Todd acknowledged that he had lied to Mr. Collingsworth and that he had been with the defendant throughout the weekend. Mr. Collingsworth asked Mr. Todd to call Mr. Fox to ask for a ride from Buffalo Trail.

During cross-examination, Mr. Collingsworth testified that he was familiar with the entire Helmick family and that he had previously investigated Mr. Helmick and Ms. Riley. He knew that the victims were involved in drug distribution and use. He responded to the Vardy Blackwater scene to determine whether the investigation required help from the Knoxville crime lab. From speaking with Becky and Bobbie, Mr.

Collingsworth identified the defendant as a suspect and learned that the defendant had left the scene in the red truck.

TBI Special Agent and Forensic Scientist Charly Castelbuono testified as an expert in forensic biology and DNA analysis. She tested the duct tape for DNA evidence and found that the tape found on the floor of the bedroom contained the DNA of Mr. Helmick and Bobbie. The defendant was excluded as a possible contributor as to the entire DNA mixture on the tape except for one oligo in which the result was inconclusive. On the duct tape collected from the nightstand, Agent Castelbuono determined that the DNA profile matched that of Bobbie. She determined that additional duct tape collected from the scene contained the DNA of Mr. Helmick and Bobbie. She also tested three pill bottles, which she determined contained the DNA of Mr. Helmick and at least one other individual, but the results were inconclusive as to the identity of the second DNA contributor on the bottles.

On cross-examination, Agent Castelbuono testified that everyone's DNA is unique except for identical twins and acknowledged that related individuals will share more similarities in their DNA profiles. She stated that she did not conclusively find the defendant's DNA on any item that she tested.

TBI Special Agent Jennifer Spivey testified as a fingerprint expert. She received the duct tape collected from the floor of the bedroom as a wad, and she pulled the strips apart to test for fingerprints. She stated that she identified one fingerprint on the sticky side of the tape that matched the defendant's middle finger. On cross-examination, Agent Spivey stated that she did not find any fingerprints on the pill bottles that she tested.

Bobbie Helmick testified via a video-recorded deposition because she was deemed an unavailable witness for health reasons. Bobbie, who was 78 at the time of the deposition, testified that on April 8, 2016, she received a call from the defendant, asking her to "go to the bank and get [Mr. Helmick's] medication and bring it to him, and go to Phil Harrison's to get something." Bobbie stated that she tried to call Mr. Helmick to determine what item she was to get from Harrison's hardware store, but she was unable to reach him. She said that the defendant explained to her that Mr. Helmick's telephone had been dropped in water and was not working. Because she could not reach Mr. Helmick, she went to the bank to retrieve Mr. Helmick's medication and took it to him, explaining that the bank closed at 6:00 p.m. and that she knew Mr. Helmick would need the medication for the weekend. She could not recall specifically what type of medication she had retrieved from the bank other than that "it was that high-powered stuff that [Mr. Helmick] had to take."

Bobbie stated that when she arrived at Mr. Helmick's property, the defendant

-11-

was "down beside the camper working on something." She said that the defendant "sent my great grandchild out to his trailer to be with his wife out there" and to "play with the cat." Bobbie said that she could not open the door to Mr. Helmick's trailer, and the defendant opened the door for her "a little bit and stood between that and where the TV was at, so I couldn't see in the living room." She went to the bedroom because the defendant told her that Mr. Helmick was "'right back there in the bedroom getting something out from under the bed.'" Upon seeing that Mr. Helmick was not in the bedroom, she asked the defendant where he was, at which time the defendant "shoved me in the room and shut the door." Bobbie stated that she and the defendant "wrestled around quarreling a little bit, and then he started tying me up with that tape." She said that the defendant bound her hands and feet with tape and said to her, "'I want thirty minutes to get away.'"

Bobbie stated that she was standing when the defendant began taping her hands and "then somehow he got over on the little old bed that was in there and . . . fell down on it. And that's when he started putting my feet -- tying it to the chair." She said that her "heart got to hitting pretty fast on me" and that she knew "if I didn't calm down and just take it as it come that I would end up having a heart attack." Bobbie said that she told the defendant to "'[t]ake your thirty minutes, and get out of here, and leave me alone,'" and the defendant "just tied me up and left me there," but not before he "turned around and went for my pocketbook. He went in that pocketbook like a hen on a June bug. Got that medicine out of there so fast, just like a streak of lightning." Bobbie said that she told the defendant to "'[l]eave that alone,'" to which the defendant replied "'He ain't going to need it now.'" Bobbie stated that she did not know that Mr. Helmick was deceased at that point. Using her teeth, she was able to loosen the tape and free herself with "a little knife in my pocket," which she estimated took 15 to 20 minutes. As she was exiting the trailer, she saw the victims' bodies and "hollered at [Mr. Helmick] two or three times, and he never did answer me." She felt Mr. Helmick's body and found that he was "like a block of ice." She then "went outside and started hollering, and crying, and going on."

Bobbie stated that she went to the defendant's trailer "and got my granddaughter" who was going to call 9-1-1, but Becky "took the phone and said she would call." She said that when she exited Mr. Helmick's trailer, she saw the defendant "leave from out his trailer and go down Blackwater," noting "That scared me to death 'cause I thought he had my granddaughter with him." She stated that he left driving Mr. Helmick's truck.

Bobbie said that she had seen the defendant earlier that same day when he came to her house and that he "[d]idn't act like nothing was wrong" at that time. Bobbie explained that Mr. Helmick kept his medications in a safe deposit box at the bank because "[h]e was afraid someone would steal if off of him." She said that only she and Mr.

-12-

Helmick were able to get the medication from the bank and that she took it to him every Monday and Friday unless he went to get it himself. She explained that on Mondays he got only enough medication to last him until Friday, and on Fridays he got only enough to last him the weekend. Bobbie stated that on April 8, she brought with her only enough medication to last Mr. Helmick until Monday.

During cross-examination, Bobbie testified that the medication that Mr. Helmick kept at the bank was prescribed to him. She said that the defendant was at her house from 3:00 p.m. until 5:00 p.m. on April 8. She stated that the defendant knew that she was coming to Mr. Helmick's "[b]ecause he went in front of me." When Bobbie arrived at the property, the defendant came to the car and spoke with Haley, telling her to "go over to his trailer and play with the cat." She said that once in the bedroom, the defendant told her that "he was going to get those two that was there." She acknowledged that she told Mr. Collingsworth that it took her 30 minutes to free herself from the duct tape, but she explained that it was between 15 and 30 minutes. She stated that the defendant wanted her to give him 30 minutes "to get away and find them people." She saw the defendant drive away from the scene.

The State rested.

After a full *Momon* colloquy, the defendant elected to testify. The defendant testified that he had lived in Hancock County his entire life and that Mr. Helmick was his father. The defendant stated that he had one brother, Joey Helmick, who passed away when the defendant was 20-years old. When the defendant was 12-years old, Mr. Helmick was in a car accident that caused him to lose his sight. At the time of Mr. Helmick's accident, the defendant's parents were separated, but his mother moved back in with the family to help out. Once Mr. Helmick was able to get around, the defendant began driving him, and his parents separated again when the defendant was 13-years old. Because the defendant was Mr. Helmick's driver, he went everywhere with Mr. Helmick. The defendant stated that he began smoking marijuana, which he obtained from Mr. Helmick's friends, when he was 12 or 13 years old. The defendant said that his mother remained in Hancock County after her separation from Mr. Helmick, and the defendant and his brother visited her, but they continued to live with Mr. Helmick.

The defendant stated that he started having run-ins with law enforcement when he was 12 or 13 years old. He said that, after his brother died, his drug use worsened and that he got many of the drugs he used from Mr. Helmick. He stated that Mr. Helmick took prescription medication as a result of the car accident. After Joey Helmick's death, the defendant and Mr. Helmick moved to the Vardy Blackwater address in order to "get [the defendant] away from a lot of [Mr. Helmick's] buddies" because Mr. Helmick feared that the defendant was "running with the wrong people, going to end up in trouble."

-13-

The defendant stated that, when he was 17 years old, he "got sent off" after he pleaded guilty to a charge of aggravated assault on a police officer. He said that, during an incident at his mother's house, he fired a gun into the air while police were present, explaining that he "was cussing them, trying to get them to leave." The police shot the defendant once in the leg and "once through the coveralls." The defendant was sent to Mountain View, a juvenile detention facility, which caused him to leave high school before graduating. He stated that he remained at Mountain View for six months and was permitted to return home after obtaining his GED and completing a drug treatment program.

The defendant testified that his brother died because the defendant had allowed him to borrow a car, and he "got to racing and got killed." The defendant said that, after his brother's death, Mr. Helmick lived alone and that the defendant assisted Mr. Helmick with "[s]hopping, cooking, driving, helping him fix something, whatever needed to be done." He acknowledged that he and Mr. Helmick had had falling-outs and had argued but that his "day-to-day role" was to help Mr. Helmick. He described a typical day:

> I would get up in the mornings and wait on him to get up and see what we was going to do for the day. My wife would cook breakfast. Whenever he would turn the porch [light] off, I would take him breakfast over and see what we had planned for the day. That's all I done, that's all I had to do, take him to the doctor, go to the grocery store if we needed groceries, fix something if it needed fixing, whatever needed to be done.

The defendant explained that when Mr. Helmick's porch light was on, he did not go to Mr. Helmick's trailer. The defendant said that, on occasion, Mr. Helmick would send him to the defendant's mother's house for a few days when the defendant needed to "slow down from taking as much medicine as I was taking."

The defendant acknowledged that Mr. Helmick had paid his bail and hired a lawyer for him following his previous legal troubles. He also acknowledged that he had witnessed drug deals from Mr. Helmick's house. The defendant knew that Mr. Helmick kept guns "[i]n his bed, in the couches, everywhere." Although Mr. Helmick was blind, if he heard a noise outside, he would "shoot sometimes thinking somebody was out there," but his aim was "not accurate." Mr. Helmick would also sometimes fire a gun in the air. The defendant acknowledged that Mr. Helmick had shot "through the trailer on accident a couple of times." He stated that Mr. Helmick had called the police on several occasions to report a theft and that the police would "make a report or whatever they do," but "[a]s far as actually going and doing something about it," they did not help.

-14-

The defendant said that he had family in Kentucky and that he, Becky, and Mr. Helmick had traveled to Kentucky in the red truck the weekend prior to the offenses. Mr. Helmick intended to return to Kentucky, and the defendant was repairing the camper to prepare for the trip. The defendant stated that Ms. Riley began coming to Mr. Helmick's house for drugs and that Ms. Riley lived with Mr. Helmick "[o]ff and on," coming over "whenever she wanted to." The defendant stated that on April 7, Mr. Helmick and Ms. Riley came to the defendant's trailer for dinner, which the defendant said was a common practice, and when they left, the defendant followed them a "few minutes later" with a "slop bowl," which he and Mr. Helmick "took down there and fed it to [Mr. Teal's] hogs." The defendant said that he then went home and was with Becky the rest of the night.

The defendant testified that the next morning, he woke up at 10:30 a.m. and saw that Mr. Helmick's porch light was still on. He and Becky ate breakfast, watched a movie, "smoked some pot, did a little medicine" while they waited on Mr. Helmick to wake up so that they could go to town to "get knobs for the camper." Mr. Helmick acknowledged that he also intended to purchase some marijuana for the upcoming trip to Kentucky. At 12:30 p.m., seeing that Mr. Helmick's porch light was still on, the defendant and Becky decided to walk to town. On their way, they asked Mr. Gibson for a ride, and he drove them to some apartments in Sneedville. The defendant "got some pot," and he went to the hardware store while Becky went to the grocery store. The defendant called Bobbie, who told him that she had not been able to reach Mr. Helmick. Mr. Teal picked up the defendant and Becky at Hardee's and drove them home.

The defendant stated that he tried to persuade Mr. Teal to help him work on the camper, but Mr. Teal declined, saying that he was tired. After Mr. Teal left the defendant's house, the defendant went to work on the camper, which was on Mr. Helmick's side of the property. The defendant said that he noticed that Mr. Helmick's porch light was still on, and he went to Mr. Helmick's front door to wake him up. The defendant noticed that the door was slightly ajar, and he peeked inside but did not hear anything except for the television. When he entered the trailer, he saw Mr. Helmick lying on the couch and Ms. Riley lying on the floor. He said that he "hollered at my dad and I went over there and touched him and he was cold."

The defendant stated that, after determining his father was deceased, he went outside and sat on the porch "just sitting there tore all to pieces and I was thinking who could hurt" the victims. He said that the only people that came to mind was a couple that had previously robbed Mr. Helmick. The defendant reentered Mr. Helmick's trailer and took the keys to the truck and a gun from a loveseat by the front door. He then went to the camper and "started doing some pills" because he was "hurting, tore all to pieces." He explained that he did not call the police "[b]ecause I wanted to find out who done it myself" and "[d]o what needed to be done."

-15-

While the defendant was at the camper, Bobbie and Haley arrived. The defendant said that he told Haley to go to his trailer but that before he could prevent Bobbie from entering Mr. Helmick's trailer, she was already up the steps to the front door. He stated that he did not want Bobbie to see the deceased victims. Bobbie struggled to open the door to the trailer, so the defendant "opened the door and told her to go to the bedroom" off of the hallway directly inside the front door. He walked her to the bedroom, blocking her view of the victims in the living room. In the bedroom, Bobbie refused to sit down and asked where Mr. Helmick was. The defendant stated that he "made her sit down on the bed and told her what happened," that someone had killed Mr. Helmick. He told Bobbie that he "was going to go and take care of it." When Bobbie indicated that they should call for help, the defendant "told her it was too late for that" and to "give [him] thirty minutes" and he would take care of it.

The defendant stated that Bobbie "kept trying to get up and I was afraid she was going to fall so I taped her to the chair, told her I would send Becky over in a minute." He explained that Bobbie was "getting in bad shape at that time" and that he had "just picked her up out of the floor like three days before this" after she "fell at her house." He stated that he taped Bobbie's hands onto the chair and taped her ankles, using duct tape that was already in the room. He said that he then took a "couple of pill bottles" from her, went to the camper to retrieve a needle and can, and drove away in the truck. He stated that he did not know why he took the pill bottles, venturing, "just for more medicine I guess," noting that he was heavily medicated at the time.

The defendant said that before he drove away, he went to his trailer and told Becky that he "had something I needed to go take care of" and for Becky to "go check on [Bobbie] in a few minutes and see if she needed anything." The defendant stated that he drove to Mr. Teal's house to ask for a ride to the home of a couple he believed were responsible for the homicides. He said that he wanted a ride "because dad's truck was loud and I know they would recognize it when I pulled in." Because Mr. Teal's mother was nearby while the defendant spoke with Mr. Teal, he asked Mr. Teal for help loading something rather than telling him his true intentions. Mr. Teal declined to help, and the defendant drove to the location where he believed the alleged perpetrators lived but discovered that they had moved. The defendant said that he intended to "find out who had done that to dad and Tasha and kill them." When he did not find the couple he suspected of the homicides, he drove to the home of a man he believed had "ripped my dad off of a little bit of money a few days before this had happened." After discovering that the man he was searching for was not home, the defendant drove to Kyles Ford Bridge, pulled to the side of the road, and "got high again."

The defendant explained that he did not call the police because "I didn't

figure they would help" and because he "wanted to find the ones that done it myself. I wanted to find them before the police did." He said that he went to Mr. Fox's house at approximately 10:30 p.m., stating that he was acquainted with Mr. Fox through drug transactions. Mr. Fox was not home at the time but returned home 30 minutes later and brought Mr. Todd with him. The defendant continued to use drugs while waiting on Mr. Fox to return. The defendant stated that no other potential perpetrators came to his mind and that he "was just devastated, I mean I was getting high, just couldn't think straight, so mad, angry, sad, just tore all to pieces." The defendant, Mr. Fox, and Mr. Todd hung out at the truck and traded "a couple pills." The defendant stated that the gun that he had taken from Mr. Helmick's trailer was between the seats in the truck and that Mr. Fox asked him if he was interested in selling it. He said that he did not sell the gun because he needed it. The three men later went inside Mr. Fox's house and "s[a]t around mostly." The defendant denied telling Mr. Fox or Mr. Todd about the events of that day. The defendant spent the night at Mr. Fox's house, and the next day, the defendant called his mother from Mr. Todd's telephone. From his mother, the defendant learned that the police were looking for him as a suspect in the homicides.

The defendant stated that he paid Mr. Todd with "a Roxie" to take the truck to the boat dock and that he intended to "catch a ride back to Sneedville" in order to "[s]ee if I could hear something about who did what." The defendant said that, at some point, Mr. Collingsworth asked Mr. Todd to meet with Mr. Collingsworth, but Mr. Todd declined to do so until the defendant encouraged him to take the meeting. The defendant said that he knew that Mr. Collingsworth was a criminal investigator and explained that he wanted Mr. Todd to meet with Mr. Collingsworth to learn "what Teddy had said to him." After meeting with Mr. Collingsworth, Mr. Todd told the defendant that the defendant was the only suspect in the offenses, which news "bothered" the defendant. The defendant stated that he assumed the police would arrive soon, so he took the gun to the woods to avoid being found in possession of it. He said that he feared that the police would shoot him as they had done on a previous occasion. He again spent the night at Mr. Fox's house. The next day, Mr. Todd left, and the defendant expected Mr. Fox to give him a ride to Sneedville because Mr. Fox wished to acquire "some Xanaxes," but the men did not make the trip to Sneedville. That evening Mr. Todd returned to Mr. Fox's house but left again after he and Mr. Fox argued. The defendant said that the next day, he and Mr. Fox went to pick up Mr. Todd after Mr. Todd had asked for a ride, and when Mr. Todd got into the vehicle, the police arrested the defendant.

During cross-examination, the defendant acknowledged that he had a criminal history which had soured his relationship with law enforcement. He stated that he and Mr. Helmick would argue about pills but "not a lot." He denied that any of their arguments were "vicious" but acknowledged that, on occasion, Mr. Helmick had asked him to leave. The defendant stated that he did not speak with Mr. Helmick on April 8. He

-17-

explained that Bobbie was mistaken when she testified that the defendant had called her on April 8, telling her that Mr. Helmick wanted her to bring him medication from the bank, stating that Bobbie was confused about the timing of the conversations. He acknowledged that the conversation to which Bobbie testified had occurred but that it did not occur at the time she reported. He stated that he called Bobbie from the hardware store to determine if she had talked to Mr. Helmick. He also stated that when he went to Bobbie's house to pick up the lawnmower battery, he again asked if she had heard from Mr. Helmick, and she told him that she had not.

The defendant stated that he could not remember precisely what he had said to Bobbie when he took her to the bedroom but recalled that he "was trying to get her to go somewhere . . . the closest place to sit down so I could tell her what had happened." He denied that he shoved her into the room but acknowledged that he wrestled with her, stating that he "was trying to get her to sit down." He acknowledged that he forced Bobbie onto the bed, bound her hands, and moved her to the chair and bound her feet. He maintained that he had told Bobbie that the deceased victims were in the living room. He denied that he was attempting to flee, insisting, instead, that he was going to search for the perpetrators.

The defendant acknowledged that he had taken the truck to the boat dock and that he wanted to avoid law enforcement because he "didn't want to talk to them." He reiterated that he did not trust the police because of his prior encounters. He acknowledged that he had taken Mr. Helmick's telephone at the same time that he took the gun and that he had left the telephone in the truck.

On redirect examination, the defendant testified that he was in Sneedville most of the day of April 8. The defendant stated that he obtained his drugs from Mr. Helmick and from someone named Teresa. He said that Mr. Helmick gave him pills so that he "didn't get sick." The defendant clarified that he had called Bobbie twice from the hardware store—once to see whether she was home so that he could pick up the lawnmower battery and once to see whether she had spoken with Mr. Helmick and whether she was planning to go to Mr. Helmick's, hoping to catch a ride home. He explained that it was the usual time for Bobbie to take Mr. Helmick his medication if Mr. Helmick had not come to town himself to retrieve it.

The defense rested and the State presented rebuttal evidence.

On rebuttal, Hancock County Sheriff's Department Deputy William Wilder testified that in 2002, he responded to the home of Rita Helmick, the defendant's mother. Deputy Wilder determined that the defendant, a juvenile at the time, was armed with a rifle and that "the situation was grave." The defendant yelled at the officers from "some fifty yards behind the trailer," yelling, "I am going to kill you." Deputy Wilder said that he

-18-

identified himself to the defendant and tried to talk with him but that the defendant responded that "he was going to blow our expletive brains out." Deputy Wilder stated that the defendant was in a semi-prone position, looking in the direction of the officers through the scope of the rifle. The defendant "fired one shot," and the officers returned fire, striking the defendant once.

During cross-examination, Deputy Wilder testified that during the incident in 2002, he was in uniform and had identified himself as a police officer. He acknowledged that he and the other officers had their weapons drawn while they attempted to communicate with the defendant. He stated that the officers took cover before the defendant fired the first shot and acknowledged that he did not actually see in which direction the defendant shot. He said that the defendant walked toward the officers with the rifle pointed at them, at which time they retreated to a ditch. The defendant was "sweeping" with the gun as he searched for the officers. Deputy Wilder again tried talking to the defendant, but the defendant raised the rifle at the officers, and they opened fire, striking the defendant in the pelvis and "through his coveralls." Deputy Wilder stated that the defendant fired two shots during the incident. He also said that only one bullet hit the corner of the trailer home.

On surrebuttal, Rita Williams, the defendant's mother, testified that she was present during the 2002 incident. She stated that her sister had seen the defendant fire a gun into the air and called the police. The defendant was 17 years old at the time. She stated that the officers took cover behind a building, but when the defendant began walking toward them, they took cover behind a branch near the side of the trailer. She then saw the defendant get into a patrol car, but he exited without driving. Ms. Williams stated that, at that point, the officers were lying in a ditch and fired 21 shots at the defendant in the direction of the trailer where she was standing on the porch. The jury viewed photographs of bullet holes in Ms. Williams trailer, and Ms. Williams explained that each of the holes had gone through the walls to the interior of the trailer. Ms. Williams stated that, after the defendant was shot, he entered the trailer, handed Ms. Williams the gun, and barricaded himself in a bedroom. Ms. Williams took the gun outside, intending to give it to the officers, but the officers drew their weapons, and she "just threw it and run back in the house."

Based upon this evidence, the jury convicted the defendant as charged of aggravated kidnapping to facilitate theft and theft of property valued at more than $1,000 but less than $10,000 but acquitted him of the murders of Mr. Helmick and Ms. Riley and of aggravated kidnapping to facilitate the first degree murder of Mr. Helmick. The trial court amended the theft conviction to theft of property valued at more than $1,000 but less than $2,500 because, although the jury failed to assign a more specific value to the truck,

it affixed a fine of $2,500.[3]  The trial court imposed an effective sentence of 12 years' incarceration and a $27,500 fine.  Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal.  In this appeal, the defendant argues that the evidence adduced at trial is insufficient to support his convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Id.*  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id*.

## I.  Theft

The defendant challenges the sufficiency of the evidence supporting his theft conviction on grounds that the State failed to establish that Mr. Helmick was the owner of the truck.  He asserts that Mr. Helmick could not have been the owner of the truck at the time of the theft because Mr. Helmick had died by the time the defendant took the truck.  The defendant also argues that, because the State failed to present sufficient evidence that ownership vested in Ms. Graham upon Mr. Helmick's death, the defendant, as Mr. Helmick's only surviving heir, became the lawful owner of the truck.  The State contends that both Mr. Helmick and Ms. Graham had an ownership interest in the truck and that Ms. Graham became the sole owner of the truck upon Mr. Helmick's death.

---

[3]  At the time of the offense, a conviction of theft of property valued at more than $1,000 but less than $10,000 was a Class D felony.  T.C.A. § 39-14-105(1)(3) (2012).  Following the 2016 amendment of the theft grading statute, theft of property valued at more than $1,000 but less than $2,500 is a Class E felony and theft of property valued at $2,500 or more but less than $10,000 is a Class D felony.  *Id.*, § 39-14-105(1)(2).  Because the amendment to the theft grading statute established "a 'lesser penalty' than the previous version of the theft grading statute, . . . the condition provided in the Criminal Savings Statute is satisfied and . . . the amended version of the theft grading statute is applicable even where, as here, the offense occurred before the amendment's effective date."  *State v. Menke*, 590 S.W.3d 455, 470 (Tenn. 2019).  The State does not contest the trial court's valuation.

Here, the presentment charged the defendant with "knowingly obtaining or exercising control over a 1999 Dodge Ram 2500 without the owner's, Rick L. Helmick, Sr., effective consent and with the intent to deprive the owner thereof." Throughout the trial, the State repeatedly asserted that Mr. Helmick owned the truck at the time of the alleged theft and did not specifically contend that Ms. Graham was the owner of the truck. The defendant, however, argued in his closing that the State failed to prove ownership of the truck, contending that Mr. Helmick's assignment of the title to Ms. Graham on the back of his certified title was sufficient to vest ownership in Ms. Graham. In response, the State asserted in its rebuttal argument that the truck belonged to Mr. Helmick at the time of the alleged theft.

The trial court instructed the jury as to the charge of theft: "For you to find the defendant guilty of this offense, the state must [have] proven beyond a reasonable doubt . . . [that] the defendant knowingly obtained or exercised control over property owned by Rick Helmick, Sr[.]" During deliberations, the jury asked two questions relative to the ownership of the truck: "If Big Rick owned the truck, is the state responsible for filing the theft charge?" and "If Blanche Graham owned the truck, is the state responsible for filing the theft charge or is Blanche Graham?" The court responded that it was the jury's duty to "decide[] all questions of fact. The theft charges were submitted to the Hancock County Grand Jury and the Grand Jury found probable cause to return a true bill." The jury verdict forms indicate that the jury found the defendant guilty of "Theft of Property $1,000 or More but less than $10,000"; no victim was named in the verdict.

Despite its claim to the contrary at trial, the State now contends that the evidence supported a conclusion that both Mr. Helmick and Ms. Graham had an ownership interest in the truck and that Ms. Graham held the sole ownership interest in the truck upon Mr. Helmick's death. The defendant now argues that Mr. Helmick retained ownership of the truck despite his assigning the title to Ms. Graham and that the defendant inherited the truck upon Mr. Helmick's death.

As relevant to this case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Our criminal Code defines the term "owner" as "a person, other than the defendant, who has possession of *or any interest* . . . in property, even though that possession or interest is unlawful and without whose consent the defendant has no authority to exert control over the property." T.C.A. § 39-11-106(a)(28) (emphasis added). "The term 'owner' as used in Title 39 of the code is broader than its commonly understood meaning." *State v. Joel Christian Parker*, No. M2001-00773-CCA-R3-CD, 2002 WL 31852850, at *2 (Tenn. Crim. App., Nashville,

Dec. 18, 2002).[4]  An owner's possession of the property may be "actual or constructive." T.C.A. § 39-14-401(3); *see State v. Gordon Scott Katz*, No. E1999-01220-CCA-R3-CD, slip op. at 4-5, 2000 WL 1460227 (Tenn. Crim. App., Knoxville, Oct. 2, 2000) (stating that the term "owner" includes one who is merely a "beneficial" owner).

The evidence established that Mr. Helmick purchased the truck from John R. Fields on April 23, 2011, for $5,000; that Mr. Helmick used the truck as his means of transportation; and that Mr. Helmick had possession of the truck at the time of his death. The defendant argues, however, that because Mr. Helmick died before the defendant took possession of the truck, any ownership interest died with him.  The defendant also claims, for the first time on appeal, that Mr. Helmick's death vested ownership in the defendant as Mr. Helmick's only living heir.

The evidence, considered in the light most favorable to the State, established that Mr. Helmick died before the defendant drove away in the truck.  Although the issue of whether a deceased victim can be an owner for the purpose of theft has not been litigated in Tennessee courts, this court has routinely upheld convictions of theft of property for acts committed after the death of the victim.  *See, e.g.*, *State v. Susan Lynette Baker*, No. M2016-00434-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, July 31, 2017) (affirming conviction of aggravated robbery, of which theft of property is an element, when the defendant and co-defendant shot the victim in the head, "discarded his body[, and] then drove the victim's car to his residence, where they used the victim's keys to enter the home and steal NASCAR memorabilia"); *State v. Augustine John Lopez, III*, No. M2003-02307-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, June 28, 2005) (affirming conviction for theft of property when the evidence showed that the defendant took the victim's clothing, television, VCR, and vehicle after killing the victim); *State v. Ronald B. Waller*, No. 03C01-9212-CR-00429, 1993 WL 398452, at *6 (Tenn. Crim. App., Knoxville, Oct. 6, 1993) (finding the evidence sufficient to support a conviction for theft of property when "[a]fter killing the deceased, the defendant stole his vehicle . . . and drove it to Florida"); *see also, e.g.*, *State v. Johnny M. Burroughs*, No. M2005-00900-CCA-R3-

---

[4]  Contrast section 39-11-106's definition of "owner" with that provided in Code section 55-1-112:

> "Owner" means a person who holds the legal title of a vehicle, or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purpose of chapters 1-6 of this title.

T.C.A. § 55-1-112(b).

CD, 2006 WL 643161, at *7 (Tenn. Crim. App., Nashville, Mar. 9, 2006) (affirming a conviction for especially aggravated robbery, of which theft of property is an element, when the defendant took the victim's purse, shotgun, and vehicle after killing her).

Moreover, we cannot conclude that the legislature intended that the death of the named owner of property immediately preceding a theft extinguishes the ownership interest necessary to sustain a conviction of theft so as to permit a thief to escape responsibility for the theft by the simple expedient of killing the current owner of the property. We also cannot conclude that the legislature intended the State to become embroiled in the complexities of probate law in every case where both homicide and theft are alleged. The legislature cannot have intended such an absurd result. *Cf. Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010); *State v. Harrison*, 692 S.W.2d 29, 31 (Tenn. Crim. App. 1985). At the time of his death, Mr. Helmick had both possession of the truck and a beneficial interest in the truck, given that he routinely used it as a means of transportation. This evidence was sufficient to establish that Mr. Helmick was the owner of the truck for purposes of Code section 39-14-103.

As indicated, the evidence also established that Mr. Helmick signed a certificate of title for the truck, which had been issued to Mr. Helmick on May 27, 2011, to convey title to Ms. Graham on February 10, 2015. Ms. Graham did not take possession of the truck or endeavor to register the vehicle in her name. Nevertheless, because Mr. Helmick had signed the title of the truck over to Ms. Graham, she also possessed an interest in the truck under the broad terms expressed in Code section 39-11-106(26). *See* T.C.A. 39-11-106(26); *see also id.* § 55-1-112(b). Thus, the State presented sufficient evidence to support a jury's finding that either Mr. Helmick or Ms. Graham, or indeed that both, owned the truck for purposes of the theft statute. As indicated, however, the presentment specifically named Mr. Helmick as the owner of the truck. The naming of Mr. Helmick as owner was either surplusage or the evidence that Ms. Graham owned the truck resulted in a variance between the indictment and the proof. *See State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (stating that a variance results "[w]hen the evidence adduced at trial does not correspond to the elements of the offense alleged in the charging instrument"). As we discuss more fully below, the defendant is not entitled to relief under either scenario.

A surplusage issue is one of variance when the State fails to prove the existence of a fact that was alleged, albeit gratuitously, in the charging instrument. In this context, "surplusage" implicates an evidence-sufficiency issue. That being said, "[g]enerally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence. *State v. March*, 293 S.W.3d 576, 589 (Tenn. Crim. App. 2008) (citing *Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960)). Because the theft statute does not require that the State

allege or prove the identity of a specific person as the "owner" of the property,[5] the State did not have to specifically identify an owner in the charging instrument. On that score, the specification of Mr. Helmick as the owner of the truck could be deemed mere surplusage.

The courts of this State, however, have not always been clear on the issue whether the State must prove the identity of the owner when it has been alleged in the indictment. In *State v. Moss*, our supreme court considered a challenge to a conviction of theft when "the indictment states that Furlotte and Oswalt operated as a partnership, whereas, the proof states that the same two owners operated their business in corporate form." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). Noting that courts had largely dispensed with strict pleading requirements, the court concluded that "before a variance will be held to be fatal it must be deemed to be material and prejudicial." *Id.* The court held that a variance "is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial[,] and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.*

In *State v. Goins*, decided after *Moss*, our supreme court, when examining a conviction of receiving and concealing stolen property for a violation of double jeopardy principles, observed:

> The State does not have to show who stole the goods or the name of the victim of the theft, but the evidence must show that the property is owned by someone other than the defendant, that the property is in fact stolen, that the defendant received or concealed the property with knowledge of its stolen nature, and that defendant had the necessary intent to deprive the owners of their property. If, however, ownership is placed in a certain person, that must also be shown.

*State v. Goins*, 705 S.W.2d 648, 650 (Tenn. 1986). This court noted in *March*, however, that "*Goins* adjudicated a double jeopardy issue, not a variance issue" and observed that [i]t may be that the *Goins* court's comments about establishing the identity of a named owner were peculiarly related to the former offense of receiving and concealing." *March*, 293 S.W.3d at 592.

Based upon the record before us, we conclude that any variance created by

---

[5]     The State need only establish that a "person, other than the defendant" had "possession of or any interest . . . in" the stolen property. T.C.A. § 39-11-106(a)(28). As a practical matter, the identity of the owner is typically necessary to show the absence of effective consent.

evidence that Ms. Graham was also an owner of the truck was not fatal and did not result in an insufficiency of the evidence. Although the State presented some evidence to indicate that Ms. Graham was an owner of the truck, the bulk of the evidence adduced at trial indicated that Mr. Helmick was an owner of the truck and, accordingly, the evidence at trial substantially corresponded with the terms of the indictment. Furthermore, we find no indication that the information regarding Ms. Graham's interest in the truck hampered the defendant in the preparation and presentation of his defense. Finally, the defendant is protected from double jeopardy because the "record leaves no doubt that the [d]efendant has been once placed in jeopardy for the" theft of the truck. *State v. Mayes*, 854 S.W.2d 638, 642 (Tenn. 1993).

As to the defendant's claim, raised for the first time in his motion for new trial, that the presentment charging the defendant with theft was "*prima facia* invalid" upon the defendant's acquittal of the death of Mr. Helmick, we conclude that this claim is utterly without merit. The defendant argues that the jury verdicts acquitting him of the homicide of Mr. Helmick constituted new evidence that he was the owner of the truck because, by virtue of his acquittal, he was no longer statutorily barred from claiming an interest in Mr. Helmick's personal property and that, consequently, he could not be convicted of theft. The grand jury "simply is an investigatory and accusatory body which determines whether or not there is sufficient evidence to justify bringing an accused to trial." *State v. Felts*, 418 S.W.2d 772, 774 (Tenn. 1967). Because "the grand jury does not determine the guilt or innocence of an accused," *see id.*, we "will not review the judgment of the grand jury for the purpose of determining whether or not the finding was on sufficient evidence," *Parton v. State*, 455 S.W.2d 645, 648 (Tenn. Crim. App. 1970); *see State v. Gonzales*, 638 S.W.2d 841, 845 (Tenn. Crim. App. 1982) ("[I]ndictments are not open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury to support it." (citations omitted)). "An indictment returned by a grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *Gonzales*, 638 S.W.2d at 845 (citations omitted). The presentment in this case was sufficient to call for a trial on the merits. The defendant's later acquittal of the homicide charge *in the same case during the same trial* has no impact on the validity of the presentment.

In the same vein, the defendant's claim that, because he was Mr. Helmick's sole heir, he became the owner of the truck immediately upon Mr. Helmick's death, must fail. Because this issue was not presented at trial, neither party presented any evidence on Mr. Helmick's testamentary status. To be sure, the defendant presented no evidence of Mr. Helmick's intestacy, and the jury was not asked to determine whether the defendant was Mr. Helmick's sole heir for the purpose of intestacy. *See* T.C.A. § 31-2-104(b)(1) (providing that, in the event of no surviving spouse, an intestate estate passes "[t]o the issue of the decedent; if they are all of the same degree of kinship to the decedent they take equally, but if of unequal degree, then those of more remote degree take by

-25-

representation"); *id.* § 31-2-106 ("If representation is called for by this title, such representation shall be per stirpes."). Indeed, the defendant did not claim ownership of the truck at any point during his own testimony.

Moreover, an intestate decedent's personal property vests in the personal representative of the decedent's estate upon the decedent's death and *not* in the heirs or beneficiaries. *See* T.C.A. § 31-2-103 ("the personal representative shall be vested with the personal property of the decedent for the purpose of first paying administration expenses, taxes, and funeral expenses and then for the payment of all other debts or obligations of the decedent . . . ."); *id.* § 31-2-101(a) ("When any person dies intestate, *after* the payment of debts and charges against the estate, the deceased's property passes to the deceased's heirs . . . ." (emphasis added)).

Finally, the defendant's claim that the jury's acquitting him of the homicide of Mr. Helmick constitutes new evidence that he became the owner of the truck upon Mr. Helmick's death is without merit. Although it is true that "[a]n individual who feloniously and intentionally kills the decedent forfeits all benefits with respect to the decedent's estate," T.C.A. § 31-1-106(b), evidence of the individual's participation in the killing need be proven only by a preponderance of the evidence, *Hill v. Alsobrook*, 370 S.W.2d 506, 508 (Tenn. Ct. App. 1962). Consequently, the defendant's acquittal of criminal homicide does not, *ipso facto*, prevent a conclusion that he "feloniously and intentionally killed" Mr. Helmick for the purpose of inheritance under Code section 32-1-106(b). Moreover, the jury considered the theft and murder charges simultaneously. Because the defendant did not raise the issue at trial, however, the jury did not pass on the impact of the defendant's culpability in Mr. Helmick's murder on his ownership interest in the truck. Indeed, the defendant did not claim any ownership interest in the truck at trial. The fact that the jury convicted the defendant of the theft of the truck but acquitted him of Mr. Helmick's murder has no legal significance with regard to the sufficiency of the evidence. *See Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973) ("An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction."); *see also Jackson v. State*, 477 S.W.2d 213, 216 (Tenn. Crim. App. 1971).

*II. Aggravated Kidnapping*

The defendant also asserts that the evidence was insufficient to support his aggravated kidnapping conviction.

As charged in this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [t]o facilitate the commission of any felony." T.C.A. § 39-13-304(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the

other's liberty." *Id.* § 39-13-302(a). Theft of property valued at $1,000 or more but less than $10,000 is a Class D felony. *Id.* § 39-14-105 (a)(3) (2012).

Here, the defendant acknowledged that he opened the door of Mr. Helmick's trailer for Bobbie and led her to a bedroom where he "made her sit down on the bed." He also acknowledged that he taped Bobbie's hands and feet to a chair, took medication from her purse, left her in the bedroom, and drove the truck away from the property a short time later. This evidence sufficiently supports his conviction for aggravated kidnapping.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE